## GREENLEAF JOHNSON, JR., *vs.* THE SAFE DEPOSIT AND TRUST CO.

*Insane Persons—Who is Non Compos—Restoration to Reason—Application to Discharge Committee.*

If the mental unsoundness of a person is such as to render him incompetent to manage his affairs or to protect himself and family from his own weakness or the artifice of others, he is *non compos mentis* and equity has jurisdiction, upon the ascertainment of this fact, to appoint a committee to take charge of his person and property.

Where a person has been adjudicated a lunatic upon the finding of a jury and a committee of his person and estate appointed and subsequently he asks that the committee be discharged and the decree vacated, the

finding of the jury is *prima facie* evidence of continuing incapacity, and to warrant the discharge of the committee there must be clear and satisfactory proof that the party has been restored to mental soundness.

The evidence in this case examined and held to show that a person who had been previously adjudicated *non compos mentis* has not been restored to a condition of mental soundness, and consequently his petition to discharge his committee is dismissed.

*Decided December 20th, 1906.*

Appeal from the Circuit Court of Baltimore. City (STOCKBRIDGE, J.)

The cause was argued before McSHERRY, C. J., BOYD, PEARCE, JONES and BURKE, JJ.

*John V. L. Findlay* (with whom was *Thos. Mackenzie* on the brief), for the appellant.

The expression *non compos mentis* describes the class of persons who by our law are placed under the protection of the Court, both as to their persons and estates. None of the experts have characterized Johnson as *non compos* generally, nor have they attempted to class him either as a lunatic or an idiot, and one of them, has admitted that classification in this branch of mental disease was exceedingly difficult, and the best he could do was to give it the name of confusional insanity, with a mixture of paranoia.

If a person at common law or by the provisions of the Code is *compos mentis*, his right to dispose of his property at his own pleasure can not be questioned. Whether he makes a wise or improvident use of it is immaterial. His own determination and will stand as sufficient reason for his conduct. *Greenwade* v. *Greenwade*, 43 Md. 316.

Again, in the same case, this Court said that the foundation of the jurisdiction of the Courts is made to depend upon the fact of the party being *non compos mentis*. *Without such a fact, however the party may be of weak or feeble mind, the Courts will not undertake to exercise their authority.* (*Ibid.*)

The power to divest the citizen of his personal freedom and the control of his property is of an extraordinary and delicate nature and never to be exercised without the precautions demanded by the law. *Owings' case*, 1 Bland, 290. The words *non compos mentis* have been used from a very early time as an expression to denote mental derangement. *Coke's Littleton*, 246, C. 247A.

LORD ELDON, in defining the degree of incapacity that would make a person a proper subject for the exercise of the Court's authority, said it was sufficient if "it was made out that the party was unable to act with any proper and provident management, *liable to be robbed by any one* (italics ours), that imbecility of mind was not strictly insanity, but as to the mischief, calling for as much protection as actual insanity." *Ridgway* v. *Darwin*, 8 Ves. Jr. 66. But this rule differs from the rule laid down by this Court, and no mere improvidence or want of proper management is sufficient in Maryland. There must be evidence of mental derangement sufficient to constitute the subject a *non compos*, or the jurisdiction of the Courts has no foundation. And this would seem much the sounder and safer rule, for how could the Courts prescribe the degree of improvidence that would warrant their interposition? Take even the extreme case where the candidate for Court protection was likely to be robbed, put by LORD ELDON, would it be safe to adopt such a standard, or is it wiser to let the improvident and thriftless go their own ways as long as reason, memory and judgment hold?

Johnson was declared by Doctor Brush to be deficient in the *quality* of his judgment, and in proof of this he urged the instance of the relief of the girl on a sudden stroke of impulsive charity. But assuming that this was a questionable act which will not bear weighing in the balance of reason, is it sufficient in itself to stamp Johnson as a *non compos*, and rob him of his *status* as a freeman and deprive him of all voice in the management of his business affairs? We do not admit, however, that money given in this way on the impulse of the moment necessarily impeaches the judgment of the donor any

more than the gift of money to casual beggars on the street, who in most cases perhaps are far more unworthy than was the afflicted girl who was the object of Johnson's bounty. The sentiment that inspired the gift contained surely no reflection upon his mental or moral integrity. He said that he believed it to be his Christian duty to help the afflicted, and there is not a particle of evidence in the record to show that the pecuniary assistance he extended was beyond his means, or that the person who received it was not afflicted and worthy of being helped.

It is true that such sudden and spontaneous outbursts of benevolence towards complete strangers are rare, but human nature abounds in the exhibition of eccentricities and departures from the normal which fall short of unsoundness of mind. There is, we submit, nothing in the record that goes to impeach Johnson's sanity, as far as the sane management of his affairs is concerned.

*Charles McH. Howard* and *Harry N. Baetjer*, for the appellee.

It always has been, and is, almost impossible to lay down abstract rules for determining sanity *vel non*, each case depending almost entirely upon the facts peculiar to it. *Attorney-General* v. *Parnther*, 3 Brown's Chancery, 443; *Snook* v. *Watts*, 11 Beavan, 108.

It may, however, we submit, be considered settled that the position taken in the old cases, namely, that application for the assumption by a Court of Chancery of control over the person and estate of one alleged to be of unsound mind, could be maintained only upon proof of the entire absence of reason, a condition of total lunacy, has been of recent years overruled. The true rule today is that if it appear that the person whose competency is at issue, is unable "to act with any proper and provident management," or "if it is not fit that he should have the management of his pecuniary affairs," a committee will be appointed. *Colegate D. Owings' case*, 1 Bland, 385; *Greenwade* v. *Greenwade*, 43 Md. 315; *Gary* v. *Obear, Exec.*, 59

Ga. 681; *Ex parte Cranmer*, 12 Veasey, Jr. 454; *In re Holmes*, 4 Russell, 183; *Commonwealth* v. *Haskell*, 2 Brewster, 508; *Ridgeway* v. *Darwin*, 8 Veasey, Jr. 67; *In re Carmichael*, 36 Ala. 522; *Matter of the Lunacy of Mary Ann Lindsley*, 43 N. J. Eq. 10.

This rule is fully recognized in the *Colegate D. Owings'* *case, snpra*, the Court holding that under the term, "*non compos mentis*," the term used to denote those, "the care of whose estates and persons is assumed by the Court of Chancery," is comprehended every species of mental derangement which incapacitates a man from "assenting to or making a legal contract." It is immaterial what the conduct of the alleged incompetent has been in his social and other relations (upon which so much of the testimony adduced by the petitioner is based); if from the testimony and his conduct it appears that the competency to manage his estate is lacking.

Nor will the proof of isolated instances of competency, prevent the assumption of control by a Court of Chancery. Such occasions may be explained by the occurrence of a lucid interval which is not presumed to continue. *Pike* v. *Pike*, 104 Ala. 642.

With the rejection of the idea that there must be in all cases, either a state of perfect sanity or a condition of positive idiocy, came the recognition of the propriety of allowing one who was declared incompetent to nevertheless remain free and unconfined as to his person, so long as confinement is not required by his condition. There can therefore be no presumption of sanity drawn from the failure of the committee to assume control over the person of the lunatic. *Pope, Lunacy*, p. 103; *Gray* v. *Obear, Exec.*, 59 Ga. 680; *Talbott* v. *Chamberlain*, 149 Mass. 58; *Lunacy Acts*, 1890–1891, 53 Victoria, ch. 5.

If then the question is one of power to control and manage the estate, the possession of that power is to be judged by the prior transactions of the petitioner as well as by an examination of him in person and the consideration of any causes which might tend to limit such power. That the mind should

be debilitated and weakened by continued attacks of epilepsy occurring, in this case, as late as six months prior to the hearing of the petition is, we submit, a most natural result, and one that should be taken into consideration. *Attorney-General* v. *Parnther*, 3 Brown's Chancery, 444; *Ridgeway* v. *Darwin*, 8 Veasey, Jr. 67.

So, too, incompetency and recklessness in the management of his affairs prior to the appointment of his committee are potent in the proof of mental aberration. · *Buswell, Insanity*, p. 227.

In the decision of such a case, not only is the effect of the dismissal of the committee on the future of the petitioner himself to be considered, but also, we submit, its effect upon those dependent upon him. *Colegate D. Owings' case*, 1 Bland, 380.

Moreover, it should be remembered that at the hearing of the petition the Circuit Court had the benefit of a personal examination of the petitioner, a consideration which, as said by the Court in the case of *Greenwade* v. *Greenwade*, is entitled to weight. *Greenwade* v. *Greenwade*, 43 Md. 317. And further that all of the testimony on the part of the appellant is directed, not to show that there has been a change in his condition since the original finding of insanity in this case, as alleged in his petition, but to show that his condition has never been other than sane.

PEARCE, J., delivered the opinion of the Court.

In July, 1904, Greenleaf Johnson, Jr., was in due form of law found by a jury to be "of unsound mind so that he is not capable of the government of himself or the management of his estate," and the jury also found that he was seized of a large and valuable real and personal estate, and that his nearest of kin were his wife, and two children, a daughter and a son. This inquisition was duly confirmed, and the Safe Deposit and Trust Company of Baltimore was appointed committee of the person and estate of the said Johnson. These proceedings were founded upon the petition of Joseph T. Deal, president of the Greenleaf Johnson Lumber Company, in which Mr.

Johnson was interested, supported by the affidavits of Dr. Randolph Winslow, his neighbor and attending physician, and of Dr. Edward N. Brush who had examined him with reference to that proceeding.

In February, 1906, Mr. Johnson filed in that case a petition, alleging that his committee had never exercised any authority or control over his person, and had confined its attention to the control and management of his estate, and that whatever may have been his mental condition when he was adjudicated *non compos mentis*, that he was then "sane, and of sound mind, memory and understanding, and entirely able to take charge of and manage his estate," and he prayed that said committee might answer his petition, and that the decree appointing said committee should be annulled and set aside, the committee be discharged, and he be restored to his full personal liberty and to the full right to control and manage his estate. This petition was supported by the affidavits of Dr. Norman F. Hill, and Dr. Henry M. Thomas, the former being for three years past his family physician, and the latter having recently examined him for the purpose of testing his sanity; also by the affidavits of Rev. P. A. Heilman, his pastor, and of Messrs. Samuel W. Regester, Howard Cassard, Robert Andrews, and J. S. Ditch, all of whom declared their belief that he was entirely sane and competent to manage his affairs.

The committee answered this petition, admitting that it had not undertaken to exercise any control over his person, and alleging that it had no knowledge of his mental condition or of the management of his affairs, prior to its appointment, but that since that time, the result of its opportunities for observation induced the belief that no material change had occurred in his condition; that it had no purpose or desire to resist the discharge of the committee further than its discharge of duty to the Court might require, and suggested that the testimony to be produced be taken in open Court, and the petitioner be there examined, and it was so taken before JUDGE STOCKBRIDGE, who after argument dismissed the petition and from that order this appeal is taken.

We find no occasion to make any extended examination of the law governing such cases, but it may be properly observed that for the assumption or continued maintenance of control by a Court of Chancery over the person and estate of one alleged to be of unsound mind, proof of the entire absence of reason, understanding or memory is not required. In *Colegate D. Owings' case*, 1 Bland, 386, the Chancellor said, "Under the *generic* legal term, *non compos mentis*, is comprehended every species of mental derangement which incapacitates a man from assenting to, or making a legal contract;" and in *Greenwade* v. *Greenwade*, 43 Md. 315, this Court said, "The term *non compos mentis* used by the Code, embraces not only lunatics and idiots, but all persons of *unsound* mind." In all jurisdictions, both in England and in this country the disposition of the Courts is towards the establishment of a rule, which, whilst jealously guarding against the invasion of rights of person and property under the guise of such proceedings, will afford protection to the person himself and to his family dependent upon him, where any species of mental unsoundness is clearly shown to incapacitate him from protecting him and them, against his own weakness or the artifice of others.

In *ex parte Cranmer*, 12 Veasey, Jr. 454, LORD ERKSINE said: "The inquiry is whether his capacity is of that kind that fits him for the government of himself and the management of his affairs."

In *In re Mary Ann Lindsey*, 43 N. J. Eq. 9, it is said, "The unsoundness of mind which will justify proceedings under a commission in lunacy is such as to deprive the person of ability to manage his own estate," and in *Gray* v. *Obear*, 59 Geo. 675, "One may be so unsound in mind as to be sent to an insane asylum; another as to have a guardian for his person as well as his estate; and a third only to require a guardian for his property to see that it is not wasted." CHANCELLOR BLAND in *Colegate D. Owings' case, supra*, p. 380, recognizes that the law takes into account not only the right of the party himself to have his property safe guarded but the right of his family to a suitable maintenance out of his estate, for he says, "It is in

execution of this, his own right, and in fulfillment of this, his duty to his family, that the Court of Chancery has always acted, in taking care of persons who are *non compos mentis,* and their estates.    For the Court is bound, in behalf of the State, to keep the lunatic, his wife, children and household with the profits of his land and estate, and to apply the whole to their use."

These principles primarily applicable to the confirmation of inquisitions, apply with added force to petitions to supersede such inquisitions.    The finding of a jury in such a case is *prima facie* proof of continuing incapacity, and to warrant the discharge of the committee there must be clear and satisfactory proof that the party has been restored to mental soundness, and it cannot escape observation that much of the proof, and the greater part of the appellant's argument, is directed rather to the effort to show that he has never been of unsound mind, than to show he has since been restored.    We have carefully read and considered all the testimony in the case which presents only a question of fact, depending upon the proof.    All of the witnesses produced for the petitioner except Drs. Hill and Thomas, testify as acquaintances and friends, and in general terms, to their belief that he is a sane man. Rev. Mr. Heilman says he has noticed no particular change in him during nine years that he has known him, and apparently bases his belief upon the fact that Mr. Greenleaf is shown to be a man of amiable character and high morals, and consistent and faithful in his church duties.    Mr. Regester expressed the same belief derived from casual conversations with him, and has never seen any change in him during his whole acquaint-. . ance of 25 or 30 years.    Mr. Andrews had known him about seven years, and referring to general conversations with him, said "it seems to me his mind is all right."    The testimony of Mr. Ditch and Mr. Hanson was of the same general character, as was Mr. Rupps also except that the latter referred to a transaction in 1902, two years before this inquisition was taken, in which Mr. Johnson wanted to build a structure for his machinery, but under Mr. Rupp's advice and persuasion

bought some lots for the purpose which were afterwards sold by his committee at a good advance.    If this has any significance however it proves rather the good judgment of Mr. Rupp, than of Mr. Johnson.

Dr. Hill, the petitioner's family physician for the past three years, says "from his general tone of conversation I should think he was perfectly able and competent to attend to his business," but that he had never examined him for the purpose of determining his sanity.

Dr. Thomas, a specialist in nervous diseases, made three or four examinations with a view to judge of his sanity and says he believes him to be sane, that he thought he appreciated the value of money and understood a contract.    He said Mr. Johnson told him he had had some sort of convulsive attacks, but did not mention the name, and was not very clear how long since he had these.    He said that as a general thing mental impairment followed epilepsy.

Dr. Winslow, Dr. Preston, and Dr. Brush, all concurred in the opinion from their knowledge and examination of Mr. Johnson that he was not of sound mind.

Dr. Winslow said he had never seen him in an attack of epilepsy, but that it was well known he suffered from them, and that he was constrained to say he did not consider him capable of making a valid contract.

Dr. Preston, a specialist in nervous and mental diseases, and a member of the State Lunacy Board, had examined Mr. Johnson several times shortly before the inquisition was taken, and heard his testimony before JUDGE STOCKBRIDGE under this petition, and he said he could discover no change or improvement in his condition, and that in his opinion he was incapable of making a valid contract or of managing his own affairs; that he found him incapable of coherent thought, or memory; that his disorder might be termed confusional insanity and that the tendency of such a case is to degenerate.

Dr. Brush, whose business is the care of insane persons and who examined Mr. Johnson in 1904, concurred in the views of Dr. Preston, and said that Mr. Johnson's testimony on the

stand recalled his interviews with him in 1904, especially in the deficiencies of his memory, which were very marked, and that the symptoms which he exhibited in 1904 and while on the stand in this case, were consistent with and frequently resulted from epilepsy.

Mr. Boyce described an occasion since 1904 in which he saw Mr. Johnson upon the street suffering from an attack of some sort, when he did not know and could not tell where he was, and also told of another occasion about six months before that time when Johnson gave him an account of an alleged assault made by him on his step-mother, in which he said he did not use a knife as reported, and that he had brass knuckles at the time, but he took second thought and threw them away. If there were nothing more in the case it would be exceedingly difficult to find satisfactory ground for discharging this committee. But in a proceeding to supersede an inquisition, the authorities properly require the petitioner to be present in person that the tribunal in charge may be aided by its own observation of his appearance and conduct. 10 *Enc. Pl. & Pr.* 1210.

Mr. Johnson was present, and was called for the respondent. He was examined at some length and was shown six letters purporting to have been written by him to Jos. T. Deal and to the Safe Deposit and Trust Company between December 23rd, 1904 and January 6th, 1905. It would serve no useful purpose to discuss these letters, nor to detail his testimony, but his examination upon these letters discloses a want of memory which cannot be reconciled with ordinary capacity for the affairs of life. Some of these letters in themselves are very persuasive of a disordered mind. He admitted the several signatures, but could not remember when or why they were written, or anything about them, except that he knew he had written to the Safe Deposit Company such a letter as that shown him dated January 6th, 1905, referring to his removal to Philadelphia. It referred to the fact that he had made oath in Philadelphia that he was a resident of that city, and therefore demanded that the Safe Deposit Company should no

longer interfere with his affairs.    But he could not remember whether he did take such an oath, or whether he ever went before any officer for that purpose, but as the letter said he did he must have done so, though he did not know where he went, or before what officer, or what was the nature of the oath, and this although the obvious purpose in his mind at the time, was thereby to regain possession of his property. The idle hope inspired by this device, and the lapse of memory which followed its failures, are equally convincing of the impairment of his mental faculties.    One of the questions put to him was, "What was the condition of your estate at the time of the appointment of the Safe Deposit Company as your committee?" and there could be in our judgment, no more convincing evidence of a disordered mind, and of incapacity to manage the ordinary affairs of life, than in his rambling, incoherent, and unintelligible reply to an ordinary business question.

The Circuit Court had the benefit of observing the petitioner and listening to his testimony as it was delivered, and promptly dismissed the petition the same day the stenographic report of the testimony was filed and the arguments were made.

There can be no exercise of judicial power more gratifying to a Judge, than the restoration of personal liberty and property rights to one who has by the dispensation of Providence been deprived of them, when there is proper proof of restored reason, but there is no other foundation for the exercise of this power.    The order of the Court below must be affirmed.

*Order affirmed, costs above and below
to be paid out of the estate.*