MINNIE HAMILTON, by her next friend and husband, JAMES H. HAMILTON *vs.* AUGUSTA TRABER.

*Estate of Lunatic—Sale of Estate for Support of Lunatic— Application by Guardian, Committee, or Trustee.*

A Court of equity has no jurisdiction to decree a sale of the estate of a lunatic for his maintenance and support, or to effect a change of investment, until his lunacy has been established by the inquisition of a jury, and a guardian, committee, or trustee to take charge of his person and estate has been appointed according to law; and the application for such sale must be made by the guardian, committee, or trustee of the lunatic.

APPEAL from the Circuit Court of Baltimore City.

The case is stated in the opinion of the Court.

The cause was argued before BRYAN, FOWLER, ROBERTS, and MCSHERRY, J.

*Richard Bernard,* and *William A. Fisher,* for John Hand, the purchaser.

*E. P. Keech, Jr.,* and *Archibald H. Taylor,* (with whom was *Alexander H. Robertson,* on the brief,) for Minnie Hamilton, and others.

MCSHERRY, J., delivered the opinion of the Court.

The question to be decided in this case arises upon an appeal from an order overruling exceptions to the ratification of a sale of certain leasehold and fee simple property situated in Baltimore City. The sale was made under a decree passed by the Circuit Court, and the decree was founded upon a bill filed by Minnie Hamil-

Hamilton *vs.* Traber.

ton, by her husband and next friend, James H. Hamilton, against Augusta Traber. The bill alleges that the plaintiff is a niece of the defendant; that the defendant is possessed of the property therein referred to; that she is about sixty-five years of age, and is physically and mentally weak and infirm, and is in a state of childishness, dotage, and imbecility, and is incapable of the government of herself and the management of her estate; that it would be to the manifest interest and advantage of the defendant that the property should be sold, and the incumbrances of taxes, ground rents, &c., should be paid off, and the balance invested for her interest and benefit, or held subject to the order and jurisdiction of the Court. The relief prayed was that a decree might be passed, appointing a trustee to sell the property and to pay off the incumbrances, and for an investment of the balance; and there was also a prayer for general relief. The bill was sworn to and filed on April the twenty-first, 1892. On the same day a *subpœna* was issued for the defendant, returnable on the second Monday of the following May. On May the fourth, or five days before the return day of the *subpœna* had arrived, an order was passed, upon the petition of the plaintiff, appointing W. R. Brewer guardian *ad litem* to answer for the defendant, and on the same day the guardian *ad litem* filed an answer in the usual form, neither admitting nor denying the averments of the bill, and immediately thereupon a general replication was put in, and an order was passed, granting the parties leave to take testimony, and testimony was taken in behalf of the plaintiff on May the fifth and ninth. On the first of June, 1892, a decree was signed, adjudging the defendant incapable of managing her estate and property, by reason of her mental unsoundness, declaring that it would be to her interest and advantage to have the property sold, and appointing trustees to make the sale.

Finally, after some other proceedings were had, which we need not allude to, as they have no bearing on the matter now before us, a sale of Augusta Traber's property was made, under the decree, to one John Hand, and the sale was duly reported to the Court. Thereupon the purchaser filed exceptions to the ratification of the sale. These exceptions all assert that the Court had no jurisdiction to decree the sale upon the bill filed. After a hearing the Court (DENNIS, J.,) overruled the exceptions, and finally ratified the sale, and from that order this appeal was taken.

If the Court had jurisdiction to pass the decree, any mere irregularity in the proceeding, or defect in the proof could not be availed of to impeach the decree collaterally. This has been repeatedly held by this Court. But, if the Court was wholly without jurisdiction to decree the sale of the property in the proceedings then before it, the purchaser may successfully rely upon that want of jurisdiction to avoid the sale, because the decree would, in such a case, be an absolute nullity. If it be an absolute nullity it is no decree at all, and can never be treated or regarded as one. At the very threshold of the case, then, lies the inquiry : Did the Court below have jurisdiction as the case was presented, to pass the decree under which the sale was made?

Now, the bill does not show upon its face, nor does the evidence disclose, that the plaintiff had the least interest in the subject-matter of the proceeding. She had no title to, or lien on, or claim against the property of the defendant, nor had she ever been clothed, by judicial warrant or otherwise, with the slightest authority to manage, control, or interfere with the person or estate of Mrs. Traber. She was a mere volunteer, who asked a Court of equity to decree the sale of an estate belonging to some one else, not for the benefit of the plaintiff, or because of any right which the plaintiff had therein,

but solely for the alleged purpose of subserving the interest of the owner.  She sought, without being beneficially concerned in the property herself, to take it from the possession, and out of the ownership of the defendant, and to have it sold, upon and because of the mere allegations that she was a niece of the owner, and that the latter was mentally incapable of managing it.  To such a bill a demurrer would have been successful. *Story's Eq. Pl.*, secs. 503, 728; *Sellman vs. Sellman*, 63 *Md.*, 520, and that is the recognized test of whether the Court had jurisdiction or not.  *Tomlinson, et al. vs. McKaig, et al.*, 5 *Gill*, 256.  Of course, we must be understood as dealing with the bill before us, and not with a totally different or dissimilar case, like, for instance, that of *Rebecca Owings*, 1 *Bland*, 294, where the interposition of the Court is asked in behalf of a *non compos mentis* for the protection, *and not for the sale*, of the latter's property.

But apart from this phase of the jurisdictional question, which we have deemed it only necessary to mention, without fully discussing, there is another and more important aspect, which we now proceed to examine.

Lunacy or mental unsoundness did not give the English Court of Chancery jurisdiction over the person or estate of a lunatic until after an inquisition of a jury, adjudging the person to be a *non compos mentis* had been regularly found.  The authority directing the inquisition to be taken did not pertain to that Court, but was derived by delegation from the crown—it was a portion of the King's executive power as *parens patriae*, and did not belong to the Court of Chancery by virtue of its inherent and general judicial functions.  This branch of the regal authority was delegated to the Chancellor, as the personal representative of the crown, by means of an official instrument called the "sign manual," signed by the King's own signature, and sealed with

his own privy seal, and was exercised by the Chancellor alone, and not by the Court of Chancery. 3 *Pom. Eq.*, sec. 1311; *Eyre vs. Countess of Shaftsbury*, 2 *P. Wms.*, 103; *Oxenden vs. Lord Compton*, 2 *Ves.*, 69; *Lysaght vs. Royse*, 2 *Sch. & Lef.*, 151; *In re Fitzgerald, Lunatic, Ib.*, 432. Anciently, in point of fact, the custody of the persons and property of idiots and lunatics, or, at least of those who held lands, was not in the crown but in the lord of the fee. The Statute *De Prerogativâ Regis*, the *7th of Edward II, ch.* 9, gave to the King the custody of idiots, and also vested in him the profits of the idiot's lands during his life. By this means the crown acquired a beneficial interest in the lands, and, as a special warrant from the crown is in all cases necessary to any grant of its interest, the separate commission which gave the Lord Chancellor jurisdiction over the persons and property of idiots may be referred to this consideration. With respect to lunatics the *Statute of* 17 *Edward II, ch.* 10, enacted that the King should provide that their lands and tenements should be kept without waste. It conferred merely a power, which could not be considered as included within the general jurisdiction antecedently conferred on the Court of Chancery, and therefore a separate and special commission became necessary for the delegation of this new power. *Story Eq., sec.* 1335.

The existence of this vested interest in the crown is the reason that mere lunacy did not originate the jurisdiction of the Court of Chancery over the persons and estates of idiots and lunatics, but the lunacy had first to be inquired of by a jury, and found of record in accordance with the rule of law, wherever a right of entry is alleged in the crown.

After this special jurisdiction conferred by the "sign manual" had been exercised in any particular case by adjudging an individual to be a lunatic, and by appointing a committee of his person and property, a further

Hamilton *vs.* Traber.

jurisdiction then arose in the *Court of Chancery* to super-
vise and control the official conduct of the committee.
3 *Pom. Eq.*, sec. 1311; *Ex parte Grimstone, Amb.*, 707.
The power of the committee to deal with the estate was,
at common law, very limited. It was restricted to the
preservation of the estate, and to the application of the
rents and income to the proper support and maintenance
of the lunatic, to the exclusion even of creditors, if
necessary. *Ex parte Dikes,* 8 *Ves.*, 79; *Hastings, Ex
parte,* 14 *Ves.*, 182. But the jurisdiction of the Court
of Chancery, acquired in the manner just stated, and
after the preliminary finding of an inquisition, did not
include authority to decree the sale of the lunatic's real
estate for his maintenance and support until that power
was distinctly conferred by Acts of Parliament passed
sometime after the American Revolution. Thus the
*Act of* 43 *Geo. III, ch.* 75, entitled " An Act to authorize
the sale or mortgage of the estates of persons found
lunatics by inquisition in England or Ireland respec-
tively, &c.," and the subsequent *Act of* 11 *Geo. IV and
1 Wm. IV, ch.* 65, *secs.* 27, 28, 29 *and* 30, were passed
with this view. But these Acts presuppose, before the
Chancellor can decree a sale, that a prior adjudication
of lunacy has been made by a jury.

The Maryland Court of Chancery did not, either under
the Proprietary Government or after the Revolution,
possess any greater or larger powers with respect to
lunatics or their estates than the English Chancery was
clothed with when the colonies separated from the mother
country. Statutes passed after Maryland became a State
extended the authority of the Chancellor; and to them,
but to no inherent powers of the Chancery Court, must
resort be had for the origin of the jurisdiction it may
now exercise to decree a sale of a lunatic's estate for his
maintenance and support.

Among the first Acts of Assembly relating to the con-
veyance of real estate held by a *non compos mentis* was

that *of* 1773, *ch.* 7, which provided that where any infant or *non compos mentis* was seized of any land in trust, or by way of mortgage, or charged with the payment of money or tobacco, or bound by an agreement to convey, on petition of the person for whom the infant or lunatic shall be seized in trust, or of the mortgagor, or the person entitled to the money or tobacco, or of the person entitled to specific performance, the Chancellor, after hearing all the parties, shall order a conveyance. The *Act of* 1785, *ch.* 72, *sec.* 6, gave to the Chancellor full power and authority to superintend, direct, and govern the affairs and concerns of persons who are or may be idiots or lunatics, both as to the care of their persons and the management of their estates. The same section empowered the Chancellor, upon the application of a *creditor* of the lunatic, if satisfied of the justice of the claim, and that it will be for the benefit and advantage of the estate of the lunatic to discharge the debt, to direct a sale of the personal estate, and if that be insufficient then to order a sale of so much of the real estate as may be necessary. The *Act of* 1833, *ch.* 150, *sec.* 1, abrogated so much of this section as required the Court to be satisfied that the sale would be conducive to the interest of the lunatic's estate. *Sec.* 12 of the same Act of 1785, provided for the sale of lands where infants and lunatics have a joint interest or an interest in common with other persons, and *sec.* 8 of the *Acts of* 1794, *ch.* 60, made provision for partition of lands so held. The *Act of* 1790, *ch.* 60, *sec.* 2, authorized the Chancellor to direct the sale of a lunatic's personal property if it appeared to be beneficial to convert it into money, and to place it at interest.

None of this legislation had reference to the sale of a lunatic's property, either real or personal, for his support. Until the passage of the *Act of* 1800, *ch.* 67, the Court of Chancery had, neither under its inherent juris-

diction, as derived from the English Chancery, nor under any colonial or subsequent Act of Assembly, the slightest authority to decree a sale of the estate of a *non compos mentis* for his support. The Act of 1800 after reciting in its preamble that "whereas by law the Chancellor is confined in making provision for the support of idiots, lunatics and persons *non compos mentis* to the annual proceeds of the estate; and whereas it appears reasonable to this General Assembly that the power should be increased," for the first time conferred that power. At the same time the statute expressly declared in what cases, and in what cases only, that power should be exercised; and these were "in all cases where trustees shall or may be appointed under the authority of the Chancery Court for the management of the estates and persons of lunatics." This legislation now codified in *secs.* 96 *and* 98 *of Art.* 16, *of the Code* is still restricted in its application, for under the Code the proceeding authorizing such a sale must be commenced by the guardian, committee, or trustee of the *non compos mentis.* *Sec.* 98 provides that "the Court, upon the application of the guardian, committee, or trustee of any person *non compos mentis* may decree the sale of any real or personal property to which such *non compos mentis* may be entitled, and order the money to be invested, &c." This is the legislation, and the only legislation under which the Courts of equity, which succeeded the Court of Chancery, derive their power to make sale of a lunatic's estate, either for the purposes of his maintenance and support, or for the purpose of effecting a change of investment. All the other statutes codified in other sections of *Art.* 16 *of the Code,* relating to lunatics and their property, have reference to sales deemed necessary for other reasons than those just named. But the power to sell for his maintenance, or to make a change of investment, can only be exercised when invoked by the

guardian, committee, or trustee of the *non compos mentis*, for the statute is explicit in declaring that the application must be made by such guardian, committee, or trustee. Necessarily, then, there must be, prior to such application, a guardian, committee, or trustee in existence, properly appointed and duly qualified, to institute the appropriate proceedings. And this Court has so expressly decided in *Estate of Dorney, Lunatic*, 59 *Md.*, 70. Before a person can be permanently divested of his property, merely because he is a lunatic, he must first be formally adjudged *non compos mentis;* and even then this extraordinary power to decree a sale can only be exerted when the Court is appealed to by the legally constituted guardian, committee, or trustee who is charged with the duty of suitably maintaining the unfortunate, and protecting and managing his estate. In a word, his *status* as a lunatic must first be established by the inquisition of a jury, and a guardian or committee of his person and estate must then be appointed according to law, before any proceeding can be taken by any one to procure a sale of his estate for his maintenance, or for a change of investment. The Court's authority to decree a sale of the estate of a lunatic for his support, and for a change of investment, being derived solely from the statute can only be rightfully exercised when invoked by the only person who is, under the Code, permitted to invoke it. A mere stranger to the lunatic's estate, though akin to him by blood, has no standing in Court for such a purpose. Having no interest in the lunatic's estate whilst the lunatic lives, and not being intrusted with the custody and control of his property by any proceeding whatever, he would be simply a volunteer, and his bill of complaint would be wholly ineffectual to give the Court jurisdiction at all. It is repugnant to the plainest dictates of natural justice that one having no interest in or claim against the

Hamilton *vs.* Traber.

estate of another, should still possess the right to procure a decree stripping the latter of the ownership of his property, and simultaneously adjudging him a lunatic, without the solemn inquisition of a jury, upon a mere *ex parte* allegation, and substantially *ex parte* proof of the owner's mental infirmity. For such a proceeding no precedent has been cited or can be found.

The bill of complaint in this case was not filed by a creditor, nor by any one having an interest in or lien on the property decreed to be sold; and as Mrs. Traber has never been found, by an inquisition, to be *non compos mentis*, and as, under our statutes, no one but the guardian, committee, or trustee of a person who has been actually found by a jury to be a lunatic, can make application to a Court of equity for a decree directing the sale of the lunatic's property for his support, or to effect a re-investment, it is perfectly obvious that the Court which passed the decree under which the sale now excepted to was made, was entirely without jurisdiction, and that the decree is, in consequence, a pure nullity, and not merely the result of an irregularity. This being so, the purchaser under that decree can get no title at all, and his exceptions to the ratification of the sale should have, therefore, been sustained. The order overruling those exceptions and finally ratifying the sale, will, for the reason that the Court was without jurisdiction to pass the decree under which the sale was made, be reversed with costs.

> *Order reversed, with*
> *costs in this Court, and*
> *in the Court below.*

(Decided 21st June, 1893.)