## Ex Parte IN THE MATTER OF THE ESTATE OF JANE B. MOORE BRISTOR.

*Inquisitions in lunacy; jurisdiction of a Court of Equity over; appeals; authority of deputy sheriff.*

Under the Code of Public General Laws, Article 5, section 26, an appeal will lie to the Court of Appeals from a decree of a Court of equity made under the authority of the Code, Article 16, section 107, relating to the persons and estate of persons *non compotes mentis.*                    p. 618

In Maryland the procedure leading up to an adjudication of mental unsoundness remains as it existed, independent of statute, under the English practice.                    p. 619

The jurisdiction of a Court of equity to confirm an inquisition in lunacy is not a special and limited jurisdiction created by statute, and the right of an appeal to the Court of Appeals exists, although not specially conferred.                    p. 619

Proceedings for an inquisition of lunacy are not affected by the fact that they were conducted by the deputy sheriff instead of by the sheriff.                    p. 620

On appeal, a decree of a Court of equity sustaining the finding of the jury, and confirming an inquisition of lunacy, was reversed on the ground that the evidence as a whole was not sufficient to justify depriving the defendant of the control of her estate.                    p. 628

*Decided April 19th, 1911.*

Appeal from Circuit Court No. 2 of Baltimore City (SHARP, J.).

The cause was argued before BOYD, C. J., BRISCOE, PEARCE, PATTISON and URNER, JJ.

*William L. Marbury* and *H. N. Abercrombie* (with a brief by *Francis A. Buschman*), for the appellant.

*George Moore Brady* and *William Milnes Maloy* (with whom was *T. Howard Embert* on the brief), for the petitioner, Charles M. Bristor.

URNER, J., delivered the opinion of the Court.

The appellant, Jane B. Moore Bristor, on September 16, 1910, wrote to a representative of the Board of Foreign Missions of the Presbyterian Church a letter in part as follows:

"As I have entered my seventieth year and am an invalid from exposure and wounds received upon battle fields of the Rebellion where with my mother I worked to relieve the wounded, I am putting my affairs in order to be ready for the great summons. Lately I have given my pictures and books largely to Lincoln University and Asheville Industrial School, N. C., and as I read again in *The Land of the Vedas* of the awful condition of women in India, I long to do something for their relief. If I had known that special work would be allowed, then several deeds that have been made to the American Board would have been in favor of my beloved church * * * I intend to prepare—that is, my lawyers will—two deeds, one of which will give to my son, my only living child, about forty years old, and single, nearly one thousand dollars per year in ground rents and in which he is to have a life interest only * * * I have always supported by son. He is not a strong man, and at one time early in life he had an attack of melancholia and wandered from home hoping to get a position. He is a member of the Presbyterian Church, perfectly moral in his habits; but, in my opinion, persons who have had mental trouble should not marry, and Charles would be a prey if I left him all I have made or even all I have inherited. I provide for him amply, but at his death these rents in which he has a life interest go to the Presbyterian Board for special work among destitute girls in India, China and Africa. The other deed will convey a number of ground rents to you for the same work." (It was stated elsewhere in the letter that these rents would amount to about $1,000 per year.) "What I have reserved for

myself, my son's and my own use, will probably be deeded to
you later on, or at least some to home and some to foreign. My
tastes are all literary, and I greatly wished to do some good
work in that line before I go, but more was to be made by
attending to investments, and I have made in twenty years more
than three times what was left me by my mother, besides giving
away about thirty thousand dollars * * * I want to deed now
lest I should be called away suddenly * * * My mother was very
much impressed many years ago by the satement in the *Life of
Wesley,* that he attended so faithfully to all his affairs that he
left directions what should be done with any loose change that
might be found in his pockets at the time of his death."

This letter, sealed in an envelope, was handed by Mrs.
Bristor to her son Charles to be mailed. He performed this
duty after he had opened and read the letter and had it
copied by his attorneys. Soon afterwards he filed a petition
in Circuit Court No. 2 of Baltimore City for an inquisition
as to his mother's sanity. He alleges in substance in the peti-
tion that his mother has been for more than ten years past
"of that degree of unsoundness of mind that unfits her to be
in possession of her property and to be clothed with the
power of alienating any part of her estate;" that she has
been "a woman of strong personality and active mentality;
that she was a nurse on battlefields in the Civil War and
during her subsequent years has suffered from the exposure
and hardship to which she was subject in that honorable
service;" that her husband, from whom she was divorced, is
deceased; that she has been for many years interested in the
temperance cause, but more recently has devoted all her time,
thought and energy to the Woman's Suffrage cause and the
work of Foreign Missions; that to such an extent has she
thought and written upon these movements and so largely
has she contributed to their advancement, especially in the
case of mission work in foreign fields, that her mind,
enfeebled by advancing years, is now controlled by delusions
on the subjects indicated, and especially that of foreign mis-
sions, and that she is deprived of reason and judgment and

is impelled to give nearly all of her property to foreign mission work to the exclusion of her relatives who have had every reason to expect to be the natural objects of her bounty.

This application was supported by the petitioner's affidavit, and a writ was issued by order of the Court directing the sheriff of Baltimore City to inquire by a jury "whether the said Jane B. Moore Bristor be so far deprived of her understanding that she is altogether unfit and unable to govern herself or to manage her affairs." A jury of fourteen members was empaneled and after a prolonged and contested hearing, twelve of the jurors, being a sufficient number under the law (*Alexanders Chancery Practice,* 224), joined in a finding that Mrs. Bristor was of unsound mind and incapable of the government of herself or the management of her property. After the return of the inquisition to the Circuit Court a motion to quash was filed by Mrs. Bristor upon various grounds, of which the only ones necessary to be considered were that the inquisition was tried and heard by the sheriff's deputy and not by the sheriff in person, and that the finding was against the evidence and the weight of the evidence adduced before the jury. A complete stenographic record was kept of all the testimony taken at the inquisition and was filed in the Court below as part of the proceedings. Upon the evidence thus presented the Court sustained the finding of the jury, confirmed the inquisition, and appointed a committee to assume control of Mrs. Bristor's person and estate. In the oral opinion of the learned judge who passed the decree his conclusion was stated, as to the two specific objections we have mentioned, that the verdict of the jury was correct on the evidence, and that no satisfactory authority had been shown for invalidating the inquisition, on the ground that the sheriff did not personally preside, in view of the long established practice in Baltimore City for the chief deputy to conduct proceedings in this nature.

The first question we have to determine is whether the decree confirming the inquisition can be reviewed by this

Court, a motion to dismiss the appeal having been filed on the theory that the action of the Court below is final.

Section 107 of the Chancery, Article (16) of the Code provides: "The Court shall have full power and authority, in all cases, to superintend and direct the affairs of persons *non compostes mentis,* both as to the care of their persons and the management of their estates, and may appoint a committee, or a trustee or trustees, for such persons, and may make such orders and decrees respecting their persons and estates as to the Court may seem proper."

It is provided by Article 5, section 26, of the Code, that: "An appeal shall be allowed from any final decree, or order in the nature of a final decree, passed by a Court of Equity, by any one or more persons parties to the suit", * * *

While we have found no instance of an appeal to this Court from a decree ratifying an iniquition of lunacy, there are cases in which appeals from orders refusing to supersede inquisitions, where restoration to sanity was claimed, or to rescind the decree of confirmation for alleged irregularity in the proceedings, have been entertained. *Johnson* v. *Safe Deposit Co.,* 104 Md. 460; *Greenwade* v. *Greenwade,* 43 Md. 313; *Royal Arcanum* v. *Nicholson,* 104 Md. 472. The only statutory authority under which the right to prosecute such appeals could have existed is that contained in the section last cited. In *Tome* v. *Stump,* 89 Md. 264, the right of appeal under this section from an order appointing a committee for an habitual drunkard was distinctly recognized. The power to supersede the inquisition is derived from the same statutory source as the power to set it aside originally. In every such instance the judicial authority described in the section quoted is as "comprehensive as language can make it". *Estate of Dorsey,* 59 Md. 69. The Court may refuse to issue a commission, even in a case of undoubted insanity, if such refusal appears to be for the best interests of the person affected. *Rebecca Owings Case,* 1 Bland, 293; and the inquisition may be set aside or superseded if the party has been improperly found to be a

lunatic.  *Alexander's Chancery Practice,* 227, 238.  The judgment of the Court may be based upon depositions, or the respondent may be discharged after a personal examination.  If the Court is convinced of the party's sanity it should not hesitate to supersede or set aside the inquisition. This procedure is independent of the right of the alleged lunatic to traverse the finding and to have the issue as to his sanity determined by a jury of the county upon a trial before the Court.  (*Ibid.*)  The controlling question to be determined by the Court, upon motion either to quash or to supersede, is whether the person alleged to be of unsound mind is in fact incapable of managing his person or estate. A finding of insanity by the jury is advisory, and is a prerequisite to an adjudication by the Court to that effect, but it is not conclusive as against the objection of the party protesting his competency and invoking the Court's own judgment upon this vitally important question.  We see no reason to doubt that a decree passed in the exercise of such a general authority and jurisdiction is a proper subject of review under the terms of the statute giving the right to any of the parties to a suit to appeal to this Court from any final decree of a Court of Equity.

It is to be observed that the Code, while conferring upon Courts of Equity general jurisdiction with respect to persons *non compotes mentis,* does not prescribe the method by which the incapacity shall be ascertained.  The course of procedure leading up to an adjudication of mental unsoundness remains as it existed, independently of statute, under the English practice, whose origin and theory are fully and clearly discussed in *Hamilton* v. *Traber,* 78 Md. 26.  The decree confirming the inquisition in this case was therefore not passed in pursuance of a special and limited jurisdiction created by statute, and the present question is not affected by the rule that in such proceedings a right of appeal does not exist unless it is specially conferred.  *Jackson* v. *Bennett,* 80 Md. 76; *Textor* v. *B. & O. R. R. Co.,* 107 Md. 223.

The cases in other jurisdictions cited to support the motion to dismiss the appeal were mainly concerned with prescribed statutory procedures which were found not to contemplate any appellate review.

Another preliminary question to be determined is that relating to the conduct of the inquisition by the deputy sheriff. It is conceded that the deputy who presided has held his office for many years and is customarily assigned to duties of this nature under all writs of inquiry. There is nothing in the record to indicate that any objection to his serving in this capacity was made at any time during the progress of the inquisition. For this reason, and in view of the long-established practice in Baltimore City, and in at least one of the counties, as we are informed, to have the sheriff's deputy preside on such occasions, we should be very strongly disposed, even in the absence of authority, to affirm the action of the Court below in overruling the objection now under consideration. But we are satisfied upon precedent and principle that the regularity of the proceedings was not affected by the fact that they were conducted by the deputy sheriff. In *Tillottson* v. *Cheetham,* 2 Johnson, 63 (N. Y. Supreme Court of Judicature), an elaborate opinion by CHIEF JUSTICE KENT discussed the question now presented. In that case a motion was filed to set aside an inquisition on the ground of its execution by the sheriff's deputy. "This," said the learned jurist, "appeared to me upon the argument to be a novel objection; for it has been usual to execute writs of inquiry before the deputy with as little hesitation as before the sheriff. * * * The deputy is an officer *coeval* in point of antiquity with the sheriff, and is recognized in the most ancient statutes. * * * The creation of deputies arose from an impossibility of the sheriff's performing all the duties of his office in person. The powers of the deputy have consequently been ascertained at an early date. The general criterion by which to test his authority is declared in the case of *Levett* v. *Farrar* (*Cro. Eliz.* 294), in which the Court said that if a writ is directed to the

sheriff by the name of his office, and not by a particular name, and doth not expressly command him to execute it in person, the under sheriff may execute it. * * * There are numerous cases within the circle of the sheriff's duties in which these inquests of office are requisite, and in which no doubt has been entertained that a deputy was competent to summon a jury and take inquest, although the objection would equally go to every inquest in every possible case. * * * The cases in which the sheriff must personally preside at the inquisition are all *special* cases in which the writ requires the personal attendance of the sheriff." The writs relating to inquiry of waste and *redisseisin* are mentioned as instances in which the attendance of the sheriff is commanded *in propria persona,* and the conclusion is stated that except in cases where the statute or the writ itself directs the sheriff to attend in person "there is no case in which a writ of inquiry may not be executed by a deputy." In the present case there is no direction for the execution of the writ by the sheriff personally.

In *Turner* v. *Holtzman,* 54 Md. 159, it was held that a deputy sheriff duly appointed possesses such authority as the sheriff himself may exercise.

It is argued that the duty of presiding at an inquisition involves the performance of judicial functions, such as the determination of questions as to the admissibility of evidence, and that such authority can not be delegated by the sheriff to a subordinate officer. In *Tillittson* v. *Cheetham, supra,* it was complained that the deputy sheriff who officiated had improperly excluded the testimony of certain witnesses, but the Court nevertheless sustained the regularity of the proceedings. It was held that the duties were ministerial, as they required no judicial decision upon the law concluding to a judgment. This principle was referred to with approval in *Obart* v. *Letson,* 17 N. J. Law, 78. In *Wroe* v. *Harris,* 2 Washington (Va.) 129, where a writ of inquiry was held to have been properly executed by a deputy it was said: "The inquisition is the finding of the jury, not the judgment of the

sheriff. It is returned to the Court from whence the writ emanated and it is there finally decided upon." In the execution of such a writ the practice is for the presiding officer to rule upon objections to the admissibility of evidence. This doubtless involves the exercise of judgment and discrimination, but neither the action of the officer nor the finding of the jury constitutes a final adjudication. The effective disposition of the question of sanity with which the inquiry is concerned is committed to the decree of the Court out of which the writ issued, and no one can be deprived of the control of his person or property upon a charge of lunacy unless the Court, after consideration of all objections to the course and result of the investigation, is satisfied that no injustice has been done and that the party is in fact of unsound mind. All the rights of the person whose mental condition is under examination are thus afforded ample protection as against any errors of the officer in charge of the inquisition.

The objection to the proceedings on the ground that the writ was executed by the deputy sheriff was properly overruled.

The evidence upon which the jury reached its conclusion that the appellant was insane must now be considered. In discussing this feature of the case we fully appreciate the fact that the jury had the opportunity to observe the appearance and demeanor of Mrs. Bristor during the protracted hearing and while she was being interrogated as a witness. In many instances this might be an important consideration with a Court of review in reaching a conclusion as to whether the jury's finding should be confirmed, but we are not at liberty to give it controlling weight in the case before us because of the presence here of what appears to us to be conclusive evidence of the appellant's competency to care for her person and estate. It is evident from the record that Mrs. Bristor is a woman of exceptional business ability, and it is conceded that there is no occasion to interfere with her personal liberty. The specific charge is that she is afflicted with a mania on the subject of Christian missions, and the

present proceeding was induced by her proposal to contribute
a portion of her property to that cause.  Her estate consists
principally of ground rents and produces an annual income
estimated to be at least $4,700.  In the letter from which we
have quoted she proposed to convey $1,000 of the rents to the
Board of Foreign Missions of the Presbyterian Church and
about an equal amount to her son for life with remainder to
the same board, and indicated also her intention to make a
later disposition of the residue of her estate in favor of home
and foreign missions.  Deeds were subsequently executed
conveying to the church boards representing both missions
ground rents having an aggregate annual value of about
$3,000.  These conveyances have not been recorded, but
are held by the grantees to abide the result of the present
litigation.  While they dispose of a considerable part of the
appellant's property it is clear that they were not prompted
by any insane impulse or delusion, but were executed by
her in the gratification of an earnest, intelligent and gen-
erous interest which she has manifested for years in the
beneficent objects for which she now desires, as she
approaches the close of her life, to make a final provision
out of her estate.  In determining upon this disposition the
record shows that she has given careful consideration to her
own welfare and to that of her son.  There is no reason to
doubt the correctness of her estimate that the estate she has
reserved is ample for their continued support in the manner
in which they have been accustomed to live, and the reasons
she assigns for not giving her son more than a life interest
cannot under the evidence be regarded as irrational.

The testimony is so voluminous that it would be imprac-
ticable, even if it were desirable, to discuss it in detail, but
a reference to the hypothetical question propounded to Dr.
Robert M. Bruns, the only alienist produced by the peti-
tioner for the writ, will afford an illustration of the grounds
upon which the theory of insanity was based.

The question begins by describing the subject of the
inquiry as a widow of about seventy years of age who has

suffered considerable hardship by reason of exposure in her earlier years. It then states that when excited she quotes Scripture. There is nothing in the record to suggest that this recital has any material significance. The next statement is that the person referred to "declares that the newspapers in their efforts to frown down everything of the kind have regarded missions in the same light as if a red flag were waved at a mad dog." The only declaration to this effect which Mrs. Bristor appears to have made occurred in the course of her examination by her son's counsel as a witness before the jury. When describing the purpose of the disposition she had made to the Home Missionary Society as being "for the benefit of · friendless orphan children in order that they may get an education in industrial schools" she made. use of some such expression as that quoted. There was no inquiry as to whether she had not in fact read in one or more newspapers articles in opposition to the cause in which she was interested, but the expert to whom the question was addressed was expected to assume the contrary and to attribute the statement to an insane delusion. The hypothesis then continues: "She believes without reasonable foundation that since she has attempted to get rid of all or a majority of her property she has been tortured and tormented as if she were a. fierce animal." In her impatience and resentment on account of the persecution to which she claimed. that she was being subjected in having her sanity questioned and her private affairs made public the appellant exclaimed in the course of her examination as a witness: "I have been tortured and tormented as if I were a fierce criminal." The next assumption is that "she has the delusion, without foundation, that a proceeding to test her mental condition has been instituted and carried on unjustly because one of the counsel for the petitioner is not a Protestant." The appellant had complained of what she regarded as an unnecessary repetition of questions propounded to her by the counsel for the petitioner, and in the nervous stress of her examination she declared: "There is

prejudice at the bottom of this and that prejudice is clearly shown." Upon being asked for an explanation she referred to the fact that the examining counsel was not a Protestant, and in reply to a further question she stated her belief that she was "having all this" because he was prejudiced. That this statement was due merely to momentary irritation, and did not represent a spirit of unreasoning bigotry, is shown by her later assertion, to which, however, the hypothetical question does not refer, that, "Catholics believe in them (Foreign Missions) just as much as Protestants, and the noblest specimens of foreign missionaries have been the Jesuits who have opened the veins of their arms and have taken the blood and written their willingness to go to the most forlorn and desolate places on earth, and greatly to their credit." The question next describes the person under consideration as one who "declares that an orderly Court proceeding, conducted with proper decorum, is an inquisition of the vilest kind, declares in a Court proceeding that she thinks she is in a heathen country, swears without foundation in a Court preceeding properly conducted that she has never known one accused of stealing or murder to be treated as she has been." These recitals were intended to refer to the following passages in the appellant's testimony. When pressed as to her disposition of her property she inquired: "Am I under an inquisition?" And upon being told by her counsel that it was so called legally, she said: It is an inquisition of the vilest kind." When it first developed that a copy of her letter from which we have quoted had been somehow obtained by the other side without her knowledge she exclaimed: "I should think I was in a heathen country!" Later in complaining of the repetition of a question she said: "But I have no reason to be asked so many times. I have been in Court many times and I have never known a person, even one brought up for stealing or murder, to be treated as I am." All this shows a high degree of indignation on the part of a nervous woman undergoing the ordeal of an examination which she understood to be

predicated upon a charge that she was insane; but such expressions as those just mentioned are entirely too inconsequential to support the inference to which they were directed in the hypothetical statement. The next assumptions in the question are: She declares that she does not know whether she has made a will or not and if she has made a will she does not know whether it has been destroyed or not, thinks that her son was murdered when she knows that he died of disease. The appellant's testimony was that she did not know whether she ever made a will, although she may have made one sometime ago and that if she did, it was probably destroyed. The reference in the question to the death of another son of the appellant involves a misconception of her testimony. This son, William, died away from home and his mother insisted that she had been kept in ignorance of his illness, as the result of which she thought that he did not have the care he required. In using the term mentioned in connection with his death she explained: "When a person is ill and you know they have not absolute necessities and if they keep help from him I call it murder, or very near kin to it." The hypothetical question then concludes: "She swears that her son, of about forty years of age, is a prey in the hands of a bad woman and a bad man, and cannot say who such persons are, declares in answer to a question, that her son would do anything at all that was contrary to what she wants, and in her communication written a short time before stated that he was a perfect man, a dutiful son; has considerable means and lives in a parsimonious style and in a condition much below the average condition in which persons of her means live, seldom goes out alone and then only for a short distance and for a brief period of time, apparently fearing that some harm will happen to her; what would you say was the mental condition of a woman such as I have described?

There is no attempt in the question to dispute the correctness of the appellant's belief that her son is being imposed upon by designing persons, notwithstanding her inability to

identify them, and it does not mention the fact that the
criticism of her son to which it refers was made after he had
opened her letter to the Missionary Society and had brought
his mother into Court under an inquisition as to her sanity.
The suggestion that she avoids going out because of fear that
she may be harmed has no proper support in the evidence.
The testimony showed that she lived simply but comfortably
and that she was generous in her donations to relatives.   The
hypothesis in general is erroneous in presenting out of their
proper relation the circumstances supposed to indicate mental
incapacity; *The Berry Will Case*, 93 Md. 560.   In reply to
the question the alienist said: "She is of unsound mind."
His attention was then directed to certain facts mentioned
in the testimony of other witnesses, but in our judgment
they have not sufficient probative force to require separate
discussion.   The opinion of the witness as to the appellant's
insanity was then reiterated and its form was described as
religious paranoia.   He stated that he could not testify merely
from his observation of Mrs. Bristor, during the whole of the
hearing, that she was deranged, without further examina-
tion.

A number of non-expert witnesses were produced by the
petitioner.   Some of these expressed the opinion that Mrs.
Bristor was not of sound mind.   It is not necessary to set
forth the results of our investigation as to the sufficiency
of the grounds for these expressions because the testimony of
other witnesses, who, in our judgment, were in a much better
position to form an accurate opinion as to her sanity, has
satisfied us that she possesses the requisite capacity to man-
age her affairs.   The real estate brokers with whom she has
conducted important and frequent negotiations for a num-
ber of years, the bank officials who have come in contact
with her weekly for a long period in connection with her
financial matters and who have loaned her money on her own
name, the lawyer who has attended to her legal business and
the justice of the peace before whom she has brought suits
for rents in arrear, all stated unequivocally that she is entirely

rational and capable.   Their testimony was supplemented by other convincing evidence to the same effect, including that of Dr. J. C. Clarke, superintendent of the Springfield Hospital for the Insane, who made a special and thorough examination of Mrs. Bristor, while the inquisition was pending, to ascertain her mental condition, and whose opinion is positive in favor of her competency.   She told Dr. Clarke that she intended to provide for her son, as she would not disinherit her "own flesh and blood"; but said that she was carrying out her mother's wish in making the deeds to the missionary societies and that this had been her "life object".

There are other features of the testimony on both sides which were considered of importance by the counsel for the respective parties, but to which we cannot particularly refer without unduly extending this opinion.   Upon the evidence as a whole we find no just occasion to deprive the appellant of the control of her estate and thus deny her the privilege of making any provision whatever in support of the great religious and philanthropic enterprises to which she has been so long and consistently devoted.

*Decree reversed, with costs and inquisition quashed.*