IN THE MATTER OF THE ESTATE OF LESTER L. RICKELL.

[No. 10, January Term, 1930.]

*Decided March 13th, 1930.*

The cause was argued before BOND, C. J., PATTISON, URNER, ADKINS, OFFUTT, DIGGES, and PARKE, JJ.

*D. ˙Eugene Walsh* and *Randolph Barton, Jr.,* for the appellant.

ADKINS, J., delivered the opinion of the Court.

In June, 1924, Congress passed an act, United States Code Annotated, title 38, sections 421 to 683, designated as the "World War Veterans' Act, 1924", "to provide a system for the relief of persons who were disabled, and for the dependents of those who died as a result of disability suffered in the military service of the United States between April 6, 1917 and July 2, 1921." To administer this system the act, section 425, established an independent bureau under the President, to be known as the United States Veterans' Bureau, the director of which to be appointed by the President, and by section 426 it gave the director, subject to the general direction of the President, authority to administer, execute, and enforce the provisions of the act, and, for that purpose, to make rules and regulations necessary or appropriate to carry out its provisions; it further authorized him to decide all questions arising thereunder, and provided that all decisions of questions of fact affecting any claimant to benefits should be conclusive except as otherwise provided by the act. By section 450 it provided that where any payment was to be made to a person mentally incompetent, "such payment

may be made to the person who is constituted guardian, curator, or conservator by the laws of the state of residence of claimant, or is otherwise legally vested with the care of the claimant or his estate." It would often happen in the nature of things that a beneficiary who was incompetent was without a guardian or any one legally vested with the care of his person or estate, because he had no estate to be cared for and his condition was not such as to require that he be kept under restraint; and that such an one and his friends would wish to avoid the expense and unpleasant notoriety of the ordinary inquiry by a jury as to his sanity; and out of this situation there probably grew a demand for legislation by the states. At any rate the Commissioners on Uniform State Laws proposed an act, to be known as the Uniform Veterans' Guardianship Act, and recommended its enactment by the various states. Maryland was among the states which enacted it, by chapter 74 of the Acts of 1929. It is codified as article 65 of the Annotated Code, 1929 Supplement, title "Militia," sub-title "Veterans' Guardianship." In conformity with this act Thomas N. Rickell, father and next friend of Lester L. Rickell, filed a petition or bill in which he alleged that the said Lester L. Rickell was a disabled veteran entitled to an allowance of eighty dollars a month, and accrued compensation of $1,389.21; that he had been examined by the physicians of the United States Veterans' Bureau and found mentally incompetent to manage his own affairs, and had been so rated under the laws and regulations of the said bureau; and that petitioner had been advised by said bureau that no compensation would be released on behalf of said incompetent until a guardian was appointed to receive the funds. The chancellor declined to take jurisdiction under said act, on the ground that it was unconstitutional, but retained the bill for ten days in order that plaintiff might have an opportunity to ask for leave to amend his bill, so as to pray for a writ de lunatico inquirendo. On failure of plaintiff to make such request, a decree was passed dismissing the bill. This appeal is from that decree.

The decision below was based mainly on the ground that the statute authorized the appointment of a guardian for the incompetent without a preliminary finding by a jury *de lunatico*. In support of his conclusion, the chancellor relies on decisions of this court in cases like *Hamilton v. Traber,* 78 Md. 26, and *Supreme Council of Royal Arcanum v. Nicholson,* 104 Md. 472. Those cases were concerned with the disposition of the property of the alleged *non compos*.. They did not hold that a guardian or trustee might not be appointed to protect the interest of such *non compos,* without such preliminary finding; and in *Hamilton v. Traber, supra,* that case was distinguished from cases like the *Rebecca Owings' Case,* 1 Bland, 290, where it was held that trustees might be (and they actually were in that case) appointed to protect and conserve the interests of the *non compos*. The chancellor seems to treat the benefits in the hands of the bureau as property of the *non compos,* whereas he could only obtain them by compliance with the conditions of the Act of Congress and the regulations of the bureau, by which the appointment of a guardian was a condition precedent to the payment of the money after the finding of the director that the veteran was incompetent. The director's finding of fact was made conclusive. And that was a provision which Congress had the right to make. *Corkum v. Clark,* 263 Mass. 378, and cases cited. *Silberschein v. United States,* 266 U. S. 221, 69 L. Ed. 256; *Walton et al. v. Colton,* 19 How. (U. S.) 660; *United States v. Hall,* 98 U. S. 343, 25 L. Ed. 180; 21 *R. C. L.* 217.

The Act of Congress, in effect, creates a trust, which, when this court is asked to take jurisdiction, it should treat as any other trust. The cases of *Hamilton v. Traber, supra,* and *Royal Arcanum v. Nicholson, supra,* were concerned with the common and statute law as then in force. They were not dealing with constitutional inhibitions with reference to the question with which we are here concerned, nor were any such indicated.

We do not find, as the chancellor did, that section 56B of chapter 74 of the Acts of 1929, or any other part of the act, makes it mandatory upon the court to appoint a guardian upon the filing of a petition and proof that "the director required, prior to the payment of benefits, that a guardian be appointed." That section provides:

"Whenever, pursuant to any law of the United States or regulation of the Bureau, the Director requires, prior to the payment of benefits, that a guardian be appointed for a ward, such appointment shall be made in the manner hereinafter provided."

Then follow a number of subsections setting out the proper procedure. But sections 56E and 56F provide that the certificate of the director setting forth the age of a minor, or that the alleged incompetent has been rated incompetent by the bureau, and that the appointment of a guardian is a condition precedent to the payment of any moneys due such person by the bureau, shall be *prima facie* evidence of the necessity for such appointment. And 56G requires that upon the filing of a petition for such appointment this court shall cause such notice to be given as provided by law.

In view of these later provisions the word "shall" in section 56B can only mean "may". If the finding of the director is only to be regarded as *prima facie* evidence, it follows that it may be rebutted, and that the court may refuse to appoint a guardian if it fails to find the beneficiary incompetent.

We do not find in section 56B any usurpation by the legislature of a judicial function. Making the finding of the director of the bureau *prima facie* evidence is analogous to making the finding of the Industrial Accident Commission *prima facie* correct on an appeal from its decision.

The chancellor also found usurpation in the provision in 56P, which provides that when an incompetent ward for whom a guardian has been appointed under the provisions of the act shall be declared competent by the bureau and the court, the guardian shall upon making a satisfactory accounting be discharged upon a petition filed for that purpose, in that the

action of the court is made. to depend upon the concurrence of the bureau. A possible construction of that section, however, is that it contemplates that the bureau, which is supposed to keep in touch with the ward, will bring the matter of the ward's recovery to the attention of the court, and then, on the concurrence by the court in the recommendation, the guardian shall be discharged. Of course we must construe the section in the way most favorable to its validity.

But even if that section be invalid, it would not affect the rest of the act, as the Legislature expressly declared in section 56T that the invalidity of any portion of the act should not effect the validity of any other portion thereof which can be given effect without such invalid part.

It may be contended that, even if the act is not open to the objection that it permits the taking of property without due process of law, still it may be properly challenged on the ground that it permits the status of an alleged incompetent to be fixed without such process. But why should that argument have any more force here than it had in the *Rebecca Owings' Case, supra,* or would have in any other case where the court might be called on to protect the interests of an incompetent by the appointment of a guardian?

It was said in *Ex parte Estate of Bristor,* 115 Md. at page 618: "The court may refuse to issue a commission, even in a case of undoubted insanity, if such refusal appears to be for the best interests of the person affected," citing *Rebecca Owings' Case,* 1 Bland, 293. Can it be that, on finding that the issuing of a commission would not be for the best interest of the incompetent, the court could not appoint a guardian to receive a fund the benefit of which the incompetent could not otherwise enjoy?

The chancellor further found that the act is violative of the provision of the Constitution that "The General Assembly shall pass no special law for any case for which provision has been made by an existing general law." Md. Const., art. 3, sec. 33. We are unable to concur in that view.

In *Prince George's County v. Balto. & O. R. Co.,* 113 Md. 184, the court cites *Schmalz v. Wooley,* 56 N. J. Eq. 649, where it was said that where a statute "does not relate to all persons or things of a class, but to particular persons or things of a class, it is special, as contradistinguished from a general law"; and this definition in 7 *Words and Phrases* (1st Series), 6578: "Special laws are those made for individual cases, or for less than a class requiring laws for its peculiar conditions and circumstances." The court said: "The obvious meaning of this provision of the Constitution is that where there is a general law providing for a certain class of cases, the Legislature shall not pass a special law for any particular case of that class. As said by Judge Alvey, in *State v. County Commissioners of Baltimore County,* 29 Md. 516; 'The special laws contemplated by the Constitution, are those that provide for individual cases, and the object of this provision was to prevent the abuses that occurred in the great multiplicity of legislation for particular and individual cases.' "

The act in controversy is a general law applicable to all persons coming within the class. Besides, there is no statute in Maryland prescribing the method by which the mental capacity of any person is to be ascertained; such procedure remains as it existed, independently of statute, under the English practice. *Ex parte Estate of Bristor,* 115 Md. 618. See Code, art. 16, sec. 117, and notes. The classification made by the act, we think, bears a reasonable relation to the result sought to be accomplished, and operates alike upon all persons under the same circumstances and conditions. *Storck v. Baltimore City,* 101 Md. 484; *Clark v. Harford Agricultural etc. Assn.,* 118 Md. 608.

As above suggested, the act was probably designed chiefly to enable the unfortunate beneficiaries of the Act of Congress, who are mentally incompetent by reason of shell shock or other causes growing out of their service, to receive the benefits allowed without having to be adjudicated insane by a jury. That worthy purpose should not be frustrated except

for such compelling reasons as we do not find to exist. We think the contrary view reached by the learned chancellor, and following logically from his able argument, is the result of mistaken premises and of his praiseworthy solicitude to safeguard alleged incompetents against infringement of constitutional guaranties, and to prevent mischievous interference with the independent functioning of the courts. Our interpretation of the act does not enable us to accept the premises on which the chancellor's conclusion was based. Presumably the bureau would be quite content with a committee appointed by the court after an adjudication of lunacy under a commission, in the manner suggested by the chancellor, if the incompetent or some one in his behalf should adopt that method. Indeed, as before stated, section 450 of the World War Veterans' Act, 1924, provided for the recognition of an appointment so made. But the point seems to be that the alleged incompetent desires to avoid the notoriety of that procedure, and we think he is entitled to the benefit of the act here challenged.

It may be that his mental infirmity is of a temporary character and that an adjudication of insanity by a jury would work a permanent and unnecessary injury. And yet he must submit to such procedure or else be deprived of the benefits provided for him, if the court cannot, on a finding by it of incompetency, appoint a guardian to receive and use the funds for his benefit during the continuance of the incompetency. If he is not in fact incompetent, and desires to contest such a finding by the court, he is given an opportunity to do so. And in such case there is nothing in the act to prevent the court from submitting the issue to a jury.

Nor do we think that the provisions in the act, accepting the co-operation of the bureau in safeguarding the funds, subject the act to criticism on constitutional grounds.

*Decree reversed and case remanded, appellant to pay costs.*

SLOAN, J., filed a dissenting opinion as follows:

The majority opinion in this case holds that to enforce the provisions of the Act of 1929, chapter 74 (Code, art. 65, secs. 56A to 56U), would not violate the constitutional rights of any of the persons whom the act was intended to benefit, nor amount to a surrender of judicial power by a state court to a federal administrative official.

The federal act, cited as "the World War Veterans' Act, 1924," U. S. Code, Annotated, title 38, sections 421 to 683, which was "intended to provide a system for the relief of persons who were disabled, and for the dependents of those who died as a result of disability suffered in the military service of the United States between April 6, 1917, and July 2, 1921" (section 422), provided for its administration through the "Director of the United Veterans' Bureau," who "shall administer, execute and enforce the provisions of this chapter, and for that purpose shall have full power and authority to make rules and regulations not inconsistent with the provisions of this chapter, which are necessary or appropriate to carry out its purposes, and shall decide all questions arising under this chapter, and all decisions of questions of fact affecting any claimant to the benefits of parts II, III or IV of this chapter (compensation, treatment, insurance and vocational rehabilitation), shall be conclusive except as otherwise provided herein." The decisions cited by the majority opinion, that Congress had the authority to pass such an act, are not disputed, as the state courts are bound by such decisions affecting the validity of any federal statute.

Intending to aid in the administration of the World War Veterans' Act, the Legislature of Maryland passed the Act of 1929, chapter 74, providing for the appointment of guardians for those who in the judgment of the director of the Veterans' Bureau were incompetent to receive benefits under the federal act by reason of age or mental incapacity. With the purposes of the act there can be no difference of opinion, and, if it violates no constitutional right of a citizen or confers no judicial power on an administrative official or legislative

agent or unlawfully interferes with the powers and functions of the courts of the state as an independent branch of the state government, there would be no cause of complaint with the majority decision. As was so well said by the chancellor in this case:

"It is a rule of constitutional law that the grant of judicial power to the department created for the purpose of exercising it must be regarded as an exclusive grant covering the whole power, subject to the limitations which the constitutions impose, and to those exceptions which are incidental, necessary or proper to the exercise of legislative or executive function. *Cooley on Constitutional Limitations* (5th Ed.), 176.

"In complete harmony with this statement of the law is the Constitution of Maryland, which creates a judicial system and makes it the repository of all judicial power and then assures its complete independence and freedom in the determination of justiciable questions by declaring that 'The Legislative, Executive and Judicial Powers of government ought to be forever separate and distinct from each other, and no person exercising the function of one of said departments shall assume and discharge the duties of any other.' Maryland Declaration of Rights, art. 8. This language is explicit and mandatory, and the courts, obedient to its command, have intervened whenever an encroachment came to their attention. *Beasley v. Ridout,* 94 Md. 641; *Crane v. Meginnis,* 1 G. & J. 463; *The Chancellor's Case,* 1 Bland, 595, 672.

"So it is a commonplace of our jurisprudence that the Legislature may not assume judicial power. *Miller v. Fiery,* 8 Gill, 145; *Baltimore v. Horn,* 26 Md. 194, 206, 207; *Dorsey v. Gary,* 37 Md. 64, 79; *Roche v. Waters,* 72 Md. 264, 272; *Queen Anne's County v. Talbot County,* 108 Md. 196, 199; *Harris v. Allegany County,* 130 Md. 488, 491, 494.

"As a necessary corollary to this constitutional provision, the Legislature may not delegate a judicial function to an executive or administrative department, nor encroach upon the province of the judicial branch of government by de-

priving a court of the jurisdiction conferred by the Constitution. The plenitude of the judicial power in protecting the individual in his life, liberty or property is not to be impaired by legislative usurpation.

"It was early stated in *Prout v. Berry,* 2 Gill, 147, 150, that the Legislature must leave the mode or manner of administering justice untrammeled. *State v. Northern Central Ry. Co.,* 18 Md. 193, 210; *Dorsey v. Dorsey,* 37 Md. 64, 77. Since it is a judicial function to hear and determine those matters which affect the liberty or property of a person within the state, it follows that the Legislature of Maryland cannot empower a federal executive or administrative bureau or any of its officers to determine by a ruling the minority or incompetence of a citizen of Maryland, and thus deprive the state courts of Maryland of their jurisdiction in such justiciable matters. Nor can the General Assembly make the efficacy and operation of a judgment or decree of the court of competent jurisdiction depend upon the sanction, or concurrence of any executive or ministerial officer, or of any class of persons charged with the performance of non-judicial duties. The judicial power granted by the Constitution to designated tribunals of its own creation, or inherent from the nature of their functions, can neither be abrogated nor abridged by legislative enactment. Any legislative device is void if it thwart or impair the jurisdiction of a constitutional court. If this were not sound legal doctrine, the three-fold separation of governmental power would be swept away and there would be no check upon the supreme, arbitrary and unmeasured power of the legislature. *Supra;* and *State v. Mace,* 5 Md. 337, 349; *Declaration of Rights,* articles 5, 19, 20, 23; *Constitution,* art. 4, secs. 1, 20, 29; *Flanigan v. Guggenheim Smelting Co.,* 63 N. J. L. 647, 650; *Smith v. Livesey,* 67 N. J. L. 269; *Public Service El. Co. v. Board of Public Utility Comrs.,* 88 N. J. L. 603; *Ex parte Thompson,* 85 N. J. Eq. 221, 290; *In re Walker's Estate,* 95 N. J. Eq. 619; *Adams v. State,* 156 Ind. 596; *State v. Noble,* 118 Ind. 350; *Greenough v. Greenough,* 11 Pa. St. 489; *Flynn*

*v. Central Ry. Co.,* 142 N. Y. 439; *Alexander v. Bennett,* 60 N. Y. 204; *Marvis v. Marvis,* 215 N. Y. Supp. 43; *Dexter Yarn Co. v. Amer. Fabric Co.,* 192 Conn. 529; *Kilbourn v. Thompson,* 103 U. S. 168, 26 L. Ed. 377, 387; *Murray v. Hoboken Land & Imp. Co.,* 18 How. 272, 15 L. Ed. 372, 377; *Denny v. Mattoon,* 2 Allen (Mass.) 361, 378."

It is provided by section 56D of the Act of 1929 that, "in the case of a mentally incompetent ward, the petition shall show that such a ward has been rated incompetent on examination by the bureau in accordance with the laws and regulations governing the bureau," and by section 56F, that "Where a petition is filed for the appointment of a guardian of a mentally incompetent ward, a certificate of a director or his representative setting forth the fact that such person has been rated incompetent by the bureau on examination in accordance with the laws and regulations governing such bureau; and that the appointment of a guardian is a condition precedent to the payment of any moneys due such person by the bureau shall be *prima facie* evidence of the necessity for such appointment."

There would be little room for criticism of the act from a state point of view, if it merely provided for payment to a guardian after a determination of the competency of the soldier by an inquisition, and then left the guardian or committee under the untrammeled direction of the court. This was the condition under which the Civil War Pension Act, in the cases of the mentally deficient and minor dependents, was satisfactorily administered for more than sixty years.

Under the Act of Congress and the Act of 1929, the determination of the soldier's competency is made by the director of the Veterans' Bureau, and nowhere in the Act of 1929 does it appear that his action is subject to review. Section 56F does not say that the certificate of the director shall be *prima facie* evidence of the ward's incompetency, which would ordinarily mean that it might be rebutted, but that it "shall be *prima facie* evidence of the necessity for

such appointment." The soldier has already been declared or rated incompetent, and the appointment of a guardian is a condition precedent to the payment of any money. Before the petition is filed every question necessary to the appointment is settled and determined by the director. The mere appointment of a guardian is a perfunctory act which does not call for the decision of any human rights. To have the power, however, to appoint such a custodian of one's property must be predicated on some act or proceeding the effect of which is to preserve or take away one's liberty and the right to enjoy or to take away the possession and control of his property. That this is a judicial act requires the citation of no authority. Whether it can or cannot be done without notice, an opportunity to be heard, and the judgment of a jury, is an irreconcilable difference between those who support the accepted opinion and those who disagree with it.

The only support cited for the decision is the case of *Rebecca Owings' Case,* 1 Bland, 272, where Chancellor Bland said: "Generally and technically speaking, those only are called lunatics who have been so found and returned. Without an inquest and return thereon no one can be judicially treated as a lunatic and be debarred of his liberty, or have the management of his property taken from him. * * * But, although this court will in no case undertake to go all lengths and to confine or dispose of the person of anyone as a lunatic until he has, upon solemn inquisition, been found to be *non compos mentis,* yet it will grant relief and protection to such persons without and previous to their being adjudged to be *non compos."* The only application of the last clause quoted to the facts was that the chancellor permitted the proceedings to go on with Rebecca Owings' sister, Urath Cromwell, and brother-in-law, John Cromwell, as coplaintiffs, they having joined with her to recover for her the funds left for her benefit by her mother and father, the exception to the rule as stated having no application to the merits of the case or the facts decided.

Samuel Owings had died leaving by will a large portion of

his real estate to his son, William Owings, to "hold the same to him, the said William Owings, his heirs and assigns forever, upon these express conditions, that he or they, or the person or persons to whom the estate devised to the said William Owings may eventually pass, maintain my daughter Rebecca, or pay sixty pounds current money a year for her maintenance during her natural life." The suit was brought to recover from William Owings the annual sums of money which he had failed to pay for or on account of his sister Rebecca, and which were decreed to be paid by him to John Cromwell and Urath Cromwell, who were appointed trustees to carry out the provisions of the will of John Owings because William Owings had failed to do so, the Cromwells already acting under a similar trust made by the will of the mother, an appointment confirmed by the chancellor. That was a situation which could not have been affected by any lunacy proceedings, as the status of her property rights had been determined by the wills of her father and mother, and all that was said in the opinion of the chancellor about the appointment of trustees for the protection of her estate without an inquisition *de lunatico* was superfluous and aside from the purpose of the proceeding, which was for the appointment of trustees to execute a trust which to that time had failed because the trustee named in the will of the father had not performed the duties required of him.

Although the dictum of Chancellor Bland has been stated as a rule in several cases which have come to this court, it has never been applied in any of them until its citation in the present case as authority for the appointment of a committee or guardian of an incompetent without an inquisition.

In *Hamilton v. Traber*, 78 Md. 26, 29, this court, in an opinion by Judge McSherry, wherein the history of the law applicable to such a case as this was reviewed, said. "Lunacy or mental unsoundness did not give the English Court of Chancery jurisdiction over the person or estate of a lunatic until after an inquisition of a jury adjudging the person to be *non compos mentis* had been regularly found." In *Ex*

*parte Estate of Bristor,* 115 Md. 614, 619, it is said: "A finding of insanity by the jury is advisory and is a prerequisite to an adjudication by the court to that effect, but it is not conclusive as against the objection of the party protesting his competency and invoking the court's own judgment upon this vitally important question."

The case of *Royal Arcanum v. Nicholson,* 104 Md. 472, had in it every element which is present in this. Edwin C. Nicholson, who was a member of the Royal Arcanum, had died leaving a three thousand dollar benefit certificate wherein his wife, Camilla D. Nicholson, was named as beneficiary. She had been adjudged insane by a jury. Her committee sued the Royal Arcanum to recover the amount of the policy. Mrs. Nicholson and the Royal Arcanum filed a petition in the lunacy case praying that the writ *de lunatico inquirendo* and the return thereon be quashed on the ground that the alleged lunatic had been adjudged.without notice or an opportunity to be heard, and this court, in answer to that proposition, said:

"We are clearly of the opinion that upon the general principles of law the supposed lunatic is entitled to reasonable notice. If he be in fact a lunatic, the notice would be undoubtedly useless, but that is the very question to be tried and until a regular trial is had and inquest made, the presumption is in favor of sanity. The consequences resulting from the determination are of the most momentous character, both personally and pecuniarily, and so long as it is possible that a sane person might, upon an *ex parte* examination, be found to be insane, every principle of justice and right requires that he should have notice and be allowed to make manifest his sanity and to refute and explain the evidence tending to prove the reverse," pages 482, 483. *Hamilton v. Traber,* 78 Md. 26, 29, 34, 35.

In *Royal Arcanum v. Nicholson,* there was just as sound a reason for invoking the dictum. of the *Owings* case as there is in the instant case. In that case there was a fund, just as there is here, provided for the benefit of the alleged incom-

petent, and without the intervention of a jury this court could have said a jury was not necessary and have said it should have been paid to the committee for her protection. But no! Judge Burke, speaking for this court, said: "Until a regular trial is had and inquest made, the presumption is in favor of sanity," and if found sane the beneficiary would be entitled to the proceeds of the certificate.

The Act of 1929, chapter 74, by section 56G does say: "Upon the filing of a petition for the appointment of a guardian under the provisions of this sub-title, the court shall cause such notice to be given as provided by law." Notice of what? That a petition has been filed and that the appointment of a guardian is prayed for the soldier. No opportunity or right here to the soldier to ask for a jury to adjudge him sane or insane. An administrative official at Washington has already determined that, and his acts are not subject to review by our courts. If the court conducts an inquiry into the mental competency of the ward, and decides that he is sane, it might mean that the soldier's compensation would be withheld by the director and the purpose of the law defeated, as the court could not tolerate the administration of a sane man's estate by a committee in lunacy. *Greenwade v. Greenwade,* 43 Md. 313, 315.

Nowhere in the act is there any provision for a trial by jury, and the application for it by the ward and adjudication of sanity by a jury would be ineffectual unless concurred in by the director of the bureau, whose decision is the only effective one in the premises. As he determines, the compensation is paid directly to the soldier or to a guardian.

I cannot agree with the construction the majority opinion puts on section 56P of the act. The incompetent cannot be declared competent without the concurrence of the director, and we thus have a situation wherein the orders and decrees of an independent and constitutional tribunal would be subordinated to the judgment of an administrator who is beyond the reach of and not subject to its decrees. Quoting the chancellor, "The only time the court is given the power to

pass upon the question of mental competency is after the appointment of a guardian, when the guardian may be discharged from his duties provided both the bureau and the court shall declare the ward competent. It is noteworthy that the court's adjudication on the question is futile if not concurred in by the separate finding of the bureau. Thus the determination of a court of general jurisdiction of a justiciable issue of fact may be nullified by the non-concurrence or failure to act of a mere administrative federal tribunal. It is submitted that this is a limitation upon the effect of a judicial finding which is not tolerable upon any theory of constitutional law, and is beyond the power of the legislature to impose. The judiciary is a co-ordinate branch of the state government, and the General Assembly has no power so to subordinate the functions of the court as to make it substantially in this respect an appanage of a federal bureau." Tenth Amendment to Constitution of the United States; articles 8, 20, 23, Maryland Declaration of Rights.

To the objection that the legislation under review is class legislation for which provision is made by a general law of the state (Const., art. 8, sec. 33), it ought only to be necessary to say that insanity knows neither race, creed, color nor class. It chooses its victims without regard to their station in life, and there is no theory by which the right to trial by jury can be accorded the sane and denied the insane, and that is just what this act does.

For the reasons stated I cannot agree with the majority opinion filed in this case, and I am authorized by Judges Offutt and Digges to say that they concur in this opinion.