UNITED STATES v. NEW YORK, N. H. & H. R. CO. et al.

(Circuit Court, D. Massachusetts. December 4, 1908.)

No. 483.

1. CONSTITUTIONAL LAW (§ 209*)—"DUE PROCESS OF LAW"—"EQUAL PROTECTION OF LAWS."

There is a substantial distinction between the fifth amendment of the federal Constitution, which is obligatory only on the United States, and secures due process of law, and the fourteenth amendment, which is obligatory on the states and prohibits the denial of the equal protection of the laws; the latter expression being broader than the former, though the mere denial of equal protection of the laws may run into the other limitation. Mere discrimination, however, does not necessarily have that effect.

[Ed. Note.—For other cases, see Constitutional Law, Cent. Dig. §§ 678, 727; Dec. Dig. § 209.*

For other definitions, see Words and Phrases, vol. 3, pp. 2227–2256, 2423–2426; vol. 8, p. 7644.]

2. CONSTITUTIONAL LAW (§ 314*)—COURTS—ESTABLISHMENT—DUE PROCESS OF LAW.

Act Cong. Feb. 11, 1903, c. 544, 32 Stat. 823 (U. S. Comp. St. Supp. 1907, p. 951), providing that in any equity suit, in any federal Circuit Court, to protect trade and commerce against unlawful restraints and monopolies, the Attorney General may file a certificate of importance, whereupon the case shall be given precedence, and shall be heard by not

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

less than three Circuit Judges, or, if there are only two Circuit Judges in the circuit, then before them and such District Judge as they select, though discriminatory, is not unconstitutional.

[Ed. Note.—For other cases, see Constitutional Law, Cent. Dig. § 934; Dec. Dig. § 314.*]

**3. CONSTITUTIONAL LAW (§ 259*)—DUE PROCESS OF LAW.**

"Due process of law" does not prohibit the establishment of special commissions or the assignment of special judges for the trial of a specific offender, so long as there is a compliance otherwise with the rules of the common law.

[Ed. Note.—For other cases, see Constitutional Law, Dec. Dig. § 259.*]

**4. CONSTITUTIONAL LAW (§ 251*)—"DUE PROCESS OF LAW"—"LAW OF THE LAND."**

The expressions "due process of law" and "the law of the land" are synonymous.

[Ed. Note.—For other cases, see Constitutional Law, Cent. Dig. § 732; Dec. Dig. § 251.*

For other definitions, see Words and Phrases, vol. 8, pp. 7701, 7702.]

In Equity.

Asa. P. French, U. S. Atty., and Wade H. Ellis, Asst. Atty. Gen., for the United States.

Henry W. Beal, for defendants, New York, N. H. & H. R. Co., Consolidated Ry. Co., and Providence Securities Co.

Coolidge & Hight and Edgar T. Rich, for defendant Boston & M. R. R.

F. A. Farnham, for defendant Providence Securities Co.

J. H. Benton, for defendants New York, N. H. & H. R. Co. and Providence Securities Co.

Before COLT, PUTNAM, and LOWELL, Circuit Judges.

PUTNAM, Circuit Judge. This is a bill filed by the United States by virtue of the provisions of the act approved July 2, 1890, c. 647, 26 Stat. 209 (U. S. Comp. St. 1901, p. 3200), commonly known as the "Sherman" or "Anti-Trust Act," and perhaps of statutes in amendment thereof. After the bill had been filed and the subpœna issued, and certain demurrers and pleas filed by the whole or a portion of the respondents, and on October 1, 1908, the Attorney General filed the following certificate:

"In the Circuit Court of the United States for the District of Massachusetts.
"No. 483, In Equity.

"The United States, Petitioner, v. The New York, New Haven and Hartford Railroad Company et al.

"I hereby certify that, in my opinion, the above-entitled case is of general public importance, and request that the same be given precedence over others and in every way expedited, and be assigned for hearing at the earliest practicable day before not less than three Circuit Judges of the First Judicial Circuit. [Signed] Charles J. Bonaparte,
"Attorney General of the United States."

Thereupon, and with sufficient promptness, to wit, on October 20, 1908, the respondents filed the following paper, namely:

"Circuit Court of the United States for the District of Massachusetts.

"No. 483, In Equity.

"The United States of America, Complainant, v. The New York. New Haven and Hartford Railroad Company, and others, Defendants.

"Objection to hearing this case 'before not less than three Circuit Judges of the First Judicial Circuit,' as requested by the Attorney General of the United States.

"The defendants object to the hearing of this case 'before not less than three Circuit Judges of the First Judicial Circuit,' as requested by the Attorney General of the United States in his certificate filed October 1, 1908, for the following, among other, reasons:

"First. Because such three Judges sitting for the hearing of this case, as thus requested, will not be an inferior court ordained and established by the Congress of the United States, within the meaning of the Constitution of the United States. and especially within the meaning of section 1, art. 3, Constitution of the United States.

"Second. Because it is not competent for the Congress under the provisions of the Constitution of the United States to authorize the hearing and determination of this cause by three Circuit Judges in the manner requested by the Attorney General in his said certificate.

"Third. Because the three Circuit Judges who are requested by the Attorney General to hear and determine this cause have no jurisdiction thus to hear and determine it.

"Fourth. Because this cause being brought and now pending in the Circuit Court of the United States, and the parties being by proper pleadings at issue therein, the same cannot be transferred to the jurisdiction of three Circuit Judges and be by them tried as a special tribunal upon the discretionary request of the Attorney General of the United States."

The proceedings with reference to determining the jurisdiction and organization of the courts of the United States are so simple and informal that we need not consider at all whether there is any particular method by which the respondents should raise the propositions which the paper copied seeks to raise, beyond stating that there is no question that none of the issues have been waived, or lost, either by express or implied estoppel, or otherwise.

The statute by virtue of which this certificate of the Attorney General was filed, namely, section 1 of the act of February 11. 1903, c. 544, 32 Stat. 823 (U. S. Comp. St. Supp. 1907, p. 951), reads as follows:

"That in any suit in equity pending or hereafter brought in any Circuit Court of the United States under the act entitled 'An act to protect trade and commerce against unlawful restraints and monopolies,' approved July second, eighteen hundred and ninety, 'An act to regulate commerce,' approved February 4, eighteen hundred and eighty-seven, or any other acts having a like purpose that hereafter may be enacted, wherein the United States is complainant, the Attorney General may file with the clerk of such court a certificate that, in his opinion, the case is of general public importance, a copy of which shall be immediately furnished by such clerk to each of the Circuit Judges of the circuit in which the case is pending. Thereupon such case shall be given precedence over others and in every way expedited, and be assigned for hearing at the earliest practicable day, before not less than three of the Circuit Judges of said circuit, if there be three or more; and if there be not more than two Circuit Judges, then before them and such District Judge as they may select. In the event the judges sitting in such case shall be divided in opinion, the case shall be certified to the Supreme

Court for review in like manner as if taken there by appeal as hereinafter provided."

In order that the issues may be understood, we will state that the respondents do not maintain that a statute having a general application, providing that for certain purposes the Circuit Court may sit with three judges, would be invalid. Their proposition is that the statute in question is so framed that it is limited to a particular class of cases, and operative only at the request of the United States, and can never be called on by a respondent, and never by either party in suits brought by others than the United States. There can be no question that this makes an apparent discrimination, yet we are unable to perceive that it is injurious to the respondents, or any other possible respondents, in any legal sense of the word. The interests involved under the Sherman anti-trust act and its amendments are liable to include exceedingly extensive pecuniary values; and the possible remedies given thereby, which combine, with the rest, the powers, express or implied, of issuing injunctions, and of appointing receivers, and declaring forfeitures, all relating to vast properties, are of so radical a character that a hasty or inapt administration of the statute by a single judge might inevitably embarrass industries as wide as the continent, and even practically destroy them, before an appellate tribunal could be reached. Therefore, we say the statute under which the Attorney General filed his certificate is not injurious, because, on the whole, when availed of, it operates for the protection of the interests of respondents more than for those of the United States. From the standpoint of the substantial effect of the statute, the only complaint that could apparently be made is that it is meritorious, but does not go so far as it might. Nevertheless, in the eyes of the law, when legislation is discriminatory, if it is both discriminatory and unconstitutional, it is the right of parties litigant to determine for themselves what their interests are, and object to it if they see fit so to do.

It certainly cannot be maintained that the statute under which the Attorney General acted is unconstitutional merely because it is discriminatory. We can find neither in the Constitution, nor in the fundamental principles which underlie free government where the English language is spoken, any inhibition on Congress with reference to the matter now before us, unless it be in that part of the fifth amendment which secures "due process of law." Even if there were any constitutional provision applying to Congress like the fourteenth amendment, which in terms prohibited the United States from denying "the equal protection of the laws," nevertheless, even then it would follow that there might be legislation discriminatory on its face, yet constitutional because of the broad rules which have been admitted by the Supreme Court with reference to legislation sustainable by reason of classification. It is, however, necessary to observe the substantial distinction between the fifth amendment, which is obligatory only on the United States, and the fourteenth amendment, which is obligatory only on the states. The limitation in the former is "without due process of law." In the fourteenth amendment this limitation is accompanied with a prohibition of the denial of the "equal protection of the laws." Of course, the latter expression is broader than the former, although it must be

conceded that the mere denial of the "equal protection of the laws" might run into the other limitation. It is plain, nevertheless, that mere discrimination in certain particulars does not necessarily have this effect. "Due process of law," as understood when the Constitution was adopted, did not prohibit the establishment of special commissions or the assignment of special judges for trying specific offenders so long as there was compliance otherwise with the rules of the common law. Neither does it always entitle persons claiming mere civil rights to adjudications by strictly judicial tribunals. This was established as early as Murray's Lessee v. Hoboken Land Improvement Company, 18 How. 272, 15 L. Ed. 372, and indeed earlier, followed by Davidson v. New Orleans, 96 U. S. 97, 24 L. Ed. 616, Turpin v. Lemon, 187 U. S. 51, 23 Sup. Ct. 20, 47 L. Ed. 70; and, finally, by the extreme case of United States v. Ju Toy, 198 U. S. 253, 25 Sup. Ct. 644, 49 L. Ed. 1040. There are still other decisions of the Supreme Court of the same class, which, with those cited, show that the expression "due process of law" may cover a great variety of tribunals, judicial and quasi judicial. So it is clear that there may be a great variety of methods of procedure. Nevertheless, that there is somewhere a limitation is brought out in a marked way by a citation from Mr. Justice Catron of expressions used by him when sitting in the Supreme Court of Tennessee, and, of course, before the adoption of the fourteenth amendment, and approved in Cotting v. Kansas City Stockyards Company, 183 U. S. 79, 105, 22 Sup. Ct. 30, 41, 46 L. Ed. 92, as follows:

"Every partial or private law, which directly proposes to destroy or affect individual rights, or does the same thing by affording remedies leading to similar consequences, is unconstitutional and void. Were this otherwise, odious individuals and corporate bodies would be governed by one rule, and the mass of the community who made the law by another."

Of course, there is a middle ground, which it may not always be easy to find, because there may be, as intimated in the quotation from Mr. Justice Catron, circumstances under which what appears to be in form a mere change of procedure would in fact discriminate in a manner which did direct injustice, or which operated in an injurious way to burden or obstruct the obtaining of justice by a particular individual or corporation. Yet, in the fourth edition of Story on the Constitution, in the sections added to cover the late amendments, the language of Mr. Webster was quoted as follows:

"By the law of the land is most clearly intended the general law; a law which hears before it condemns; which proceeds upon inquiry, and renders judgment only after trial. The meaning is that every citizen shall hold his life, liberty, property, and immunities under the protection of the general rules which govern society."

It is settled that the expressions "due process of law" and "the law of the land" go strictly hand in hand. We understand this quotation from Mr. Webster appeared first in section 1944 of the fourth edition of Mr. Justice Story's work, and that this section was drafted by Judge Cooley, who knew as well as any one what was fit language for this purpose. We can safely adopt it for the purposes of this case.

In Twining v. New Jersey (in an opinion announced November 9, 1908), 29 Sup. Ct. 14, 53 L. Ed. —— Mr. Justice Moody has considered

thoroughly, from both historical and legal points, the meaning of the expression "due process of law"; but we have no occasion for this case to quote from him.

Following out the limitations expressed by Mr. Webster pro and con, whatever might be said if the special organization of the court required by the statute here discriminated against the respondents, or other individuals or corporations situated in a similar condition, to such an extent, or in such way, as to be injurious in the eye of the law, or as to burden the defense thus injuriously, it might well be regarded as such a denial of equality that it would amount in a constitutional sense to a denial of "due process of law." As, however we can see nothing here of this nature but in lieu thereof as we have already said, a partial, if not complete, protection to all concerned against hasty or indiscreet judgments of courts consisting of a single judge, we can find nothing which, in a constitutional sense, distinguishes this from the ordinary class of legislation by virtue of which federal courts may be held by one or two judges, or even by judges out of the district.

Coming to authorities bearing more directly on the situation before us, we call attention to Cincinnati Street Railway Company v. Snell, 193 U. S. 30, 24 Sup. Ct. 319, 48 L. Ed. 604, which seems to be so strictly analogous to the case at bar that we are unable to distinguish them so far as any substantial question is concerned. The case arose under the fourteenth amendment, broader in its limitations than the fifth amendment, and yet it involved a discrimination of precisely the character which we have here. There, as explained at pages 33 and 34 of 193 U. S., at page 821 of 24 Sup. Ct. (48 L. Ed. 604), the statute provided that the venue might be changed on the mere motion of the plaintiff in a suit against a corporation, accompanied with a purely ex parte affidavit of five persons residing in the county, while the corporation had no corresponding right, and no corresponding right existed in behalf of any plaintiff in any suit against individuals. The constitutionality of the law was sustained, and several cases cited as furnishing analogies which we need not explain in detail. It seems impossible here to escape the conclusions of the principal case, or like conclusions in United States v. Union Pacific Railroad Company, 98 U. S. 569, 25 L. Ed. 143, where there were very sweeping provisions for the exercise of a peculiar jurisdiction, limited entirely to that particular suit. The legislation was sustained, and, at page 607 of 98 U. S. (25 L. Ed. 143), the following is found in the opinion:

"But whatever be the relief asked, it could only, by the express terms of the act, be granted to that party who was in equity thereunto entitled. It is very plain that there was here no new right established, no new cause of equitable relief, no new rule for determining what were the rights of the parties. That was to be decided by the principles of equity, not new principles of equity, but the existing principles of equitable jurisprudence."

This was not in any sense a dictum, but it was necessary to the decision of the case, which seems to us to fully sustain the statute in question here, so far as it is now before us.

Some propositions made by the respondents can only be accepted as maintaining that the statute before us in effect covers an attempt to create a special court. This would not necessarily raise any question

as to "due process of law," because, as we have said, special courts were everywhere known under the common law of England; yet it would, of course, involve a peculiar question arising solely under the Constitution of the United States—that of the power of Congress to establish a special court for a particular case or a particular class of cases. If this proposition is now insisted on, it is decided against the respondents by In re Claasen, 140 U. S. 200, 11 Sup. Ct. 735, 35 L. Ed. 409, wherein was brought in question the constitutionality of a statute providing that the Circuit Court for the Southern District of New York might be held by three judges for the purpose of determining criminal cases. If the present statute creates a special tribunal, so did that statute; and there is no fundamental difference between the nature of the legislation so far as that particular topic is concerned. We find no word in the statute indicating such an intention here. We are clear in reference to this point.

On the whole, while the legislation is apparently discriminatory, it seems plain to us that it does not contravene any provision of the Constitution of the United States limiting the powers of Congress, and especially that it does not in any way deprive the respondents of "due process of law."

The attorneys for the United States have cited to us several cases where a certificate has been filed by the Attorney General like that before us, and in which three or more judges have sat as provided in the statute under investigation. The most important of them all was Northern Securities Company v. United States, 193 U. S. 197, 24 Sup. Ct. 436, 48 L. Ed. 679. This case was one involving vast interests, and was argued by very eminent counsel, including Mr. Attorney General Knox in person. In none was there any suggestion of any difficulty like that now brought to our attention. It is true that this could hardly be regarded as an authoritative fact, because no issue was made in reference thereto; but it enables us to rest more easily on the conclusion which we have reached.

The court having considered the certificate of the Attorney General filed on October 1, 1908, and the suggestions of the respondents in reference thereto, filed on October 29, 1908:

It is ordered that this case proceed in accordance with the certificate of the Attorney General, filed on October 1, 1908, pursuant to the first section of chapter 544 of the act approved on February 11, 1903, so far as that statute relates to the personality and the number of the judges to sit therein.

NOTE BY THE COURT.—While this opinion was in preparation the decision of the Circuit Court for the Third Circuit in United States v. Delaware & H. Co., 164 Fed. 215, came to hand. This decision related to several cases which were proceedings by the United States, under the so-called "commodities clause" of the interstate commerce statutes, against the various coal-carrying railroads in Pennsylvania. Three Circuit Judges sat, namely, Dallas, Gray, and Buffington; and a statement made by Judge Gray in his opinion in behalf of the court illustrates in a striking manner the vast interests which may be involved in this class of litigation, and the great detriment which

would come, not only to corporate property, but to the public at large, by an inapt decision, and particularly the reason for a requirement that Congress should give to respondents in proceedings by the United States a like right of demanding a conservative tribunal of three judges which is now given to the Attorney General. The opinion, at page 225 of 164 Fed., said as follows:

"It results, therefore, that the coal described in the foregoing categories is outlawed in interstate commerce, and must remain so, unless the defendants can divest themselves of all title or interest in the coal, coal lands, or coal companies from which the markets in other states have been so largely supplied. The enforcement of the act must, of necessity, result, either in the defendants holding their coal properties and refraining from transporting coal to other states, and confining themselves to the mining of such coal as may be used in the state of Pennsylvania, or in their divesting themselves of all title or interest, direct or indirect, in said properties, by sale or surrender thereof, as they may be able to accomplish the same. The population of the region, outside of Pennsylvania, absolutely dependent upon the use of anthracite coal for domestic or industrial purposes, is very large, and has been, no doubt moderately, estimated at from 12,000,000 to 15,000,000. The adoption of the former alternative, therefore, would entail, while it continued, an amount of suffering and deprivation that it is hard to forecast or appreciate, while the forced resort to the other would necessarily inflict upon the defendants and their stockholders a most disastrous sacrifice and pecuniary loss."