STATE TAX COMMISSION *v.* BALTIMORE NATIONAL BANK ET AL.
[No. 7, April Term, 1938.]

*Decided April 27th, 1938.*

The cause was argued, as of the January Term, before, BOND, C. J., URNER, OFFUTT, PARKE, SLOAN, MITCHELL, and SHEHAN, JJ.

*William L. Henderson, Assistant Attorney General,* with whom was *Herbert R. O'Conor, Attorney General,* on the brief, for the State Tax Commission, appellant.

*Edwin F. A. Morgan,* with whom were *Gaylord Lee Clark* and *Semmes, Bowen & Semmes* on the brief, for the Baltimore National Bank, appellee.

*Hans A. Klagsbrunn,* with whom was *C. J. Durr* on the brief, for the Reconstruction Corporation, appellee.

The following statement was made PER CURIAM.

A majority of the judges of this court having agreed in that decision, but for different reasons, the order in this case is affirmed, necessarily without an opinion for the court as a body.

*Order affirmed, with costs.*

BOND, C. J., filed an opinion as follows, in which URNER, J., concurred.

Since the decision of this court on a former appeal that the Baltimore National Bank was, in the first instance at least, required to pay the tax assessed on the shares of its preferred stock held by the Reconstruction Finance Corporation, and the affirmance of that decision by the Supreme Court of the United States, the United

States Congress has passed an act providing that, notwithstanding any privilege or consent previously granted, the shares of preferred stock of national banks, "and the shares of preferred stock, capital notes, and debentures of State banks and trust companies," acquired by the Finance Corporation, should not be subject to any taxation by any state or local taxing authority. Act of Congress March 20th, 1936, 49 Stat. 1185, Tit. 12, U. S. Code Ann., sec. 51d; *State Tax Commission v. Baltimore National Bank,* 169 Md. 65, 180 A. 260; *Baltimore National Bank v. State Tax Commission,* 297 U. S. 209, 56 S. Ct. 417, 80 L. Ed. 586. And now, another year's tax having been assessed to the bank on the same stock, an appeal was prosecuted by the bank to the lower court, and the tax there held illegal by reason of immunity conferred by that act; and from that ruling the State Tax Commission has appealed. Code, art. 81, sec. 259. The Finance Corporation, from which any tax lawfully imposed on the bank might be collected, was permitted to intervene on the appeal below. Code, art. 81, secs. 6 (6), 10 (b), and 15 (e), as amended by Laws 1929, ch. 226.

The question of constitutionality of any intergovernmental immunity to stock held by this particular stockholder has been argued again. It was a question which the Supreme Court did not decide "either directly or indirectly," on affirmance of the previous decision; the ground of the affirmance having been that Congress had expressly authorized the taxation of all shares of national banks. National Banking Act, Rev. St. sec. 5219, as amended, 12 U. S. Code Ann., sec. 548. I see no reason for reconsidering the point, as I conclude the decision of it is not necessary to the disposition of the present case. I concur in the view of the lower court that a valid immunity has been granted to the stock held by this stockholder, and that the bank, primarily liable for payment, may not be required to pay the tax on it.

It is taken as settled that stock in national banks may be taxed only by consent of the United States Congress. *People of New York v. Weaver,* 100 U. S. 539, 543, 25

L. Ed. 705; *Talbott v. Silver Bow County,* 139 U. S. 438, 440, 11 S. Ct. 594, 35 L. Ed. 210; *Davis v. Elmira Savings Bank,* 161 U. S. 275, 283, 16 S. Ct. 502, 40 L. Ed. 700; *State Tax Commission v. Baltimore Nat. Bank,* 169 Md. 65, 68, 180 A. 260. And there can be no question of the purpose of the recent act to deny that consent for taxing the stock of this particular stockholder. The act extends beyond that purpose in its attempted exemption of stock held in state banks and trust companies, but I am of opinion that the validity of the extended exemption need not be considered while passing on that of the national bank stock. The act contains an express direction, section 51f, that: "If any provision, word, or phrase of sections 51d and 51e of the title, * * * is held invalid, the remainder of such sections * * * shall not be affected thereby." It is true that such a saving clause may not be effective when it is obvious that the remainder of the statute could not, or would not, be intended to stand as the legislative will. *Carter v. Carter Coal Co.,* 298 U. S. 238, 312, 56 S. Ct. 855, 873, 80 L. Ed. 1160. But that is an exceptional condition. The direction to sever the parts and leave the remainder in force is to be followed if it can be; and here I see no adequate reason for not following it. *Fidelity & Guaranty Fire Corp. v. State Tax Commission,* 172 Md. 652, 661, 193 A. 164.

A broad question, whether the powers with which the Finance Corporation was invested by the terms of the act under which it was formed (Act Jan. 22nd, 1932, 47 Stat. 5, 15 U. S. Code Ann., sec. 601 *et seq.*) could contitutionally be exercised at all by the federal government, was raised on the former appeal, and in the Supreme Court appears to have been taken as beyond dispute. Under the circumstances I should not be disposed to consider it again, but should leave it to be decided by the higher court, if found necessary.

OFFUTT, J., filed an opinion as follows, in which MITCHELL, J., concurred.

This appeal submits but one question, whether national

bank stock, while owned and held by the Reconstruction Finance Corporation, may be taxed by the State. The Baltimore National Bank issued 50,000 shares of preferred stock, having a par value of $20 each, which on August 20th, 1933, it sold to the Reconstruction Finance Company, which still owns and holds the entire issue.

On April 20th, 1936, the State Tax Commission of Maryland notified the Baltimore National Bank that it had assessed that stock for purposes of taxation at $1,000,000. On May 4th, 1936, the bank filed a protest against the assessment and proposed taxation, and asked to be heard on the protest. A hearing was granted, evidence was submitted on behalf of the protestant and the commission, and on December 8th, 1937, the commission overruled the protest and made the assessment final. From that order the bank, by its petition of December 14th, 1937, appealed to Circuit Court No. 2 of Baltimore City. That court on January 12th, 1938, for the reasons assigned in a very able opinion, reversed the order of the State Tax Commission, and annulled and set aside the assessment. From that order the commission took this appeal.

The identical stock involved in this appeal was also assessed for taxation by the commission in 1934, while owned and held by the Reconstruction Finance Corporation, (*State Tax Commission v. Baltimore National Bank*, 169 Md. 65, 180 A. 260), and that assessment was affirmed by this court (*Ibid.*) on two grounds: (1) That the United States had consented to the taxation of the capital stock of national banks, R. S. sec. 5219, as amended, 12 U. S. Code Ann., sec. 548, and (2) that that consent followed the shares even into the hands of the Reconstruction Finance Corporation and conclusively determined their taxable quality while held and owned by it. That decision was affirmed in *Baltimore National Bank v. State Tax Commission of Maryland*, 297 U. S. 209, 56 S. Ct. 417, 80 L. Ed. 586, on the sole ground that by R. S., sec. 5219 as amended (U. S. Code Ann., title 12, sec. 548; *Cf.* Act June 3rd, 1864, 13 Stat. 99,

112, ch. 106; Act February 10th, 1868, 15 Stat. 34, ch. 7) the Congress had consented that "all" the shares of the capital stock of a national banking association should be subject to taxation, that "all" meant neither more nor less than all, that such shares were taxable without regard to their ownership, and consequently were taxable when owned and held by the Reconstruction Finance Corporation without regard to its status as an agency of the federal government.

Following that decision, Congress, by its Act of March 20th, 1936, U. S. Code Ann., title 12, sec. 51d, provided that "Notwithstanding any other provision of law or any privilege or consent to tax expressly or impliedly granted thereby, the shares of preferred stock of national banking associations, and the shares of preferred stock, capital notes, and debentures of State banks and trust companies, acquired before or after March 20, 1936 by Reconstruction Finance Corporation, and the dividends or interest derived therefrom by the Reconstruction Finance Corporation, shall not, so long as Reconstruction Finance Corporation shall continue to own the same, be subject to any taxation by the United States, by any Territory, dependency or possession thereof, or the District of Columbia, or by any State, county, municipality, or local taxing authority, whether imposed, levied, or assessed on, before or after March 20, 1936, and whether for a past, present, or future taxing period."

That act effected a withdrawal of the consent to state taxation of any of the preferred capital stock of national banks (given by R. S. sec. 5219) owned by the Reconstruction Finance Company, so long as it continued to own the same.

The question presented by this appeal is not whether the consent given by R. S. sec. 5219, affects such stock while owned by the Finance Corporation, as in the former appeals, but whether the Act of March 20th, 1936, which withdraws that consent as to such stock when owned by the Finance Corporation, and specifically prohibits the imposition of any tax by any taxing authority upon such

stock when so owned, is valid. If it is not valid, the assessment stands; if it is, it falls.

In approaching that question such general rules as that an Act of Congress cannot be declared void as in conflict with some provision of the Constitution unless the violation is too clear for reasonable doubt (*Legal Tender Cases,* 12 Wall. 457, 531, 20 L. Ed. 287), help little, for the question is too important for either compromise or border line construction.

In support of the assessment it is asserted: (1) That the stock is taxable under the tax statutes of the State, that no exemption can be implied from the nature of the Finance Corporation, because (a) it exercises no power delegated to the national government by the Federal Constitution, (b) performs no governmental function, and (c) intergovernmental immunity from taxation is reciprocal, and only extends to agencies exercising strictly governmental functions in the exercise of lawfully delegated powers, and that if the activities of the Finance Corporation are *ultra vires,* the shares are taxable; and (2) that the Act of March 20th, 1936, is invalid, because (a) it violates the due process clause of the Fifth Amendment of the Federal Constitution, (b) violates the Tenth Amendment because it derogates from the "State's sovereign right to tax," (c) disturbs the balance of "Federal-State relations, required by the Constitution as a whole"; and (3) that the act is not severable, and that if any part thereof is invalid, the whole falls.

The bank and the Reconstruction Finance Corporation, which was permitted to intervene, in answer say that the Act of March 20th, 1936, is a valid constitutional enactment, and incidentally that the Finance Corporation is an agency of the United States lawfully created, exercising functions exclusively governmental in their nature, and no other, that as such it is exempt both under State and Federal statutes from taxation, that the capital stock of national banks is not taxable except with the consent of the national government, that by the Act of

March 20th, 1936, that government not only withdrew its consent to the taxation of such stock while owned by the Finance Corporation, but strictly prohibited the taxation thereof while so held.

The suggestion that the stock is taxable under the laws of the State of Maryland is merely a conclusion drawn from the assumed predicate that the Act of 1936 is invalid, because Code, art. 81, sec. 7, as amended by Laws 1929, ch. 226, provides that "any property exempted from taxation by this State by the constitution of the United States or by any Act of Congress passed pursuant to and in conformity with" that Constitution, "shall be exempt from assessment and from State, county and city" taxation. If therefore the act is valid, the stock is under that provision of the Maryland Code exempt from taxation.

In *McCulloch v. Maryland,* 4 Wheat. 316, 427, 4 L. Ed. 579, the State of Maryland undertook to impose a tax upon a branch of the Bank of the United States. In holding the statute imposing that tax void, the Supreme Court held that such a bank as that was a convenient, useful, and essential instrument of government. In the course of the historic opinion filed by the Chief Justice in that case it is said:

"The power of Congress to create, and of course to continue, the bank, was the subject of the preceding part of this opinion; and is no longer to be considered as questionable.

"That the power of taxing it by the States may be exercised so as to destroy it, is too obvious to be denied. But taxation is said to be an absolute power, which acknowledges no other limits than those expressly prescribed in the constitution, and like sovereign power of every other description, is trusted to the discretion of those who use it. But the very terms of this argument admit that the sovereignty of the State, in the article of taxation itself, is subordinate to, and may be controlled by the constitution of the United States. How far it has been controlled by that instrument must be a

question of construction. In making this construction, no principle not declared, can be admissable, which would defeat the legitimate operations of a supreme government. It is of the very essence of supremacy to remove all obstacles to its action within its own sphere, and so to modify every power vested in subordinate governments, as to exempt its own operations from their own influence. This effect need not be stated in terms. It is so involved in the declaration of supremacy, so necessarily implied in it, that the expression of it could not make it more certain. We must, therefore, keep it in view while construing the constitution. * * *

"The people of all the States have created the general government, and have conferred upon it the general power of taxation. The people of all the States, and the States themselves, are represented in Congress, and, by their representatives, exercise this power. When they tax the chartered institutions of the States, they tax their constituents; and these taxes must be uniform. But, when a State taxes the operations of the government of the United States, it acts upon institutions created, not by their own constituents, but by people over whom they claim no control. It acts upon the measures of a government created by others as well as themselves, for the benefit of others in common with themselves. The difference is that which always exists, and always must exist, between the action of the whole on a part, and the action of a part on the whole—between the laws of a government declared to be supreme, and those of a government which, when in opposition to those laws, is not supreme."

The tax in that case was on the bank itself and not on its stock, and the opinion is consistent with the power of the state to tax the stock. 4 Wheat. 316, at page 436, 4 L. Ed. 579. Following that expression the South Carolina court held in two cases (*Bulow v. Charleston*, 1 Nott & McC. 527; *State ex rel Berney v. Tax Collector*, 2 Bailey 654), that stock of the Bank of the United States was taxable. There was no federal review of those decisions,

and shortly after that the bank went out of existence. But in 1864 the present system of national banks was organized (Act June 3rd, 1864), following an Act of 1863, to render to the national government services essential to the adequate administration of its powers and functions. *Davis v. Elmira Sav. Bank*, 161 U. S. 275, 16 S. Ct. 502, 40 L. Ed. 700; *Mercantile Nat. Bank v. Mayor, etc., of New York*, 121 U. S. 138, 7 S. Ct. 826, 30 L. Ed. 895, 901; *Farmers' & Mechanics' Nat. Bank v. Dearing*, 91 U. S. 29, 33, 23 L. Ed. 196, 199. That act, however, (chapter 106, sec. 41, R. S. sec. 5219, 12 U. S. Code Ann. 548, and note) provided that the legislature of each state might determine and direct the manner and place of taxing all shares of national banking associations located within its limits, subject nevertheless to definite restrictions and limitations.

Because of the consent given by that statute, there was neither opportunity nor occasion for the courts to deal directly with the right of the states to tax the shares of a national bank, but in applying the restrictions which were imposed as essential conditions of the consent, they were called upon to decide, and did decide, that such shares could not be taxed by the states; for if the right to tax existed apart from the statute, the federal government had no power to burden the right with the restrictions, and in affirming the validity of the restrictions, the courts necessarily decided that, apart from the statute, the states had no right to tax the shares of a national bank. In *Farmers' & Mechanics' Nat. Bank v. Dearing, supra,* it was said:

"The constitutionality of the act of 1864 is not questioned. It rests on the same principle as the act creating the second bank of the United States. The reasoning of Secretary Hamilton and of this court in *McCulloch v. Maryland*, 4 Wheat. 316, 4 L. Ed. 579, and in *Osborn v. Bank*, 9 Wheat. 738. 6 L. Ed. 204, therefore applies. The national banks organized under the act are instruments designed to be used to aid the government in the administration of an important branch of the public service.

They are means appropriate to that end. Of the degree of the necessity which existed for creating them, Congress is the sole judge.

"Being such means, brought into existence for this purpose, and intended to be so employed, the States can exercise no control over them, nor in any wise affect their operation, except in so far as Congress may see proper to permit. Anything beyond this is 'an abuse, because it is the usurpation of power which a single State cannot give'."

From that premise, in *People of State of New York v. Weaver*, 100 U. S. 539, 543, 25 L. Ed. 705, the court, in applying that provision of R. S. sec. 5219, which imposes the restriction that no tax imposed by a state on such stock shall be at a greater rate than that assessed upon other money capital in the hands of individual citizens of such state, reached the conclusion: "That the provision which we have cited was necessary to authorize the States to impose any tax whatever on these bank shares, is abundantly established by the cases of *McCulloch v. Maryland*, 4 Wheat. 316, [4 L. Ed. 579] ; *Osborn v. Bank*, 9 Wheat. 738, [6 L. Ed. 204] ; *Weston v. Charleston*, 2 Pet. 449 [7 L. Ed. 481].

"As Congress was conferring a power on the States which they would not otherwise have had, to tax these shares, it undertook to impose a restriction on the exercise of that power, manifestly designed to prevent taxation which should discriminate against this class of property as compared with other moneyed capital."

In *Des Moines Nat. Bank v. Fairweather*, 263 U. S. 103, 44 S. Ct. 23, 24, 68 L. Ed. 191, where the application of that same restriction was under consideration, that principle was accepted as settled law; the court there saying: "It is settled that the relation of the national banks to the United States and the purposes intended to be subserved by their creation are such that there can be no taxation, by or under state authority, of the banks, their property or the shares of their capital stock otherwise than in conformity with the terms and

restrictions embodied in the assent given by Congress to such taxation. *People of New York v. Weaver,* 100 U. S. 539, 543, 25 L. Ed. 705, 706; *Rosenblatt v. Johnston,* 104 U. S. 462, 26 L. Ed. 832; *Mercantile Nat. Bank v. New York,* 121 U. S. 138, 154, 7 S. Ct. 826, 30 L. Ed. 895, 901; *Talbott v. Silver Bow County,* 139 U. S. 438, 440, 11 S. Ct. 594, 35 L. Ed. 210; *Owensboro Nat. Bank v. Owensboro,* 173 U. S. 664, 669, 19 S. Ct. 537, 43 L. Ed. 850, 852; *First Nat. Bank v. Adams,* 258 U. S. 362, 42 S. Ct. 323, 66 L. Ed. 661." *First Nat. Bank v. Hartford,* 273 U. S. 548, 550, 47 S. Ct. 462, 71 L. Ed. 767; *First Nat. Bank v. Anderson,* 269 U. S. 341, 46 S. Ct. 135, 70 L. Ed. 295, and *State Tax Commission of Maryland v. Baltimore Nat. Bank,* 169 Md. 65, 180 A. 260; *Baltimore Nat. Bank v. State Tax Commission,* 297 U. S. 209, 56 S. Ct. 417, 80 L. Ed. 586, accept as beyond question the conclusions stated in these earlier cases.

Notwithstanding this unbroken line of decisions, it is suggested that the time has now come to reconsider the immunity of the shares of the capital stock of national banks in the light of present day conditions, even though that may involve modification of established precedents. That suggestion is, however, both too late and too early. It is too late because the law is settled, and the precedents are established, and the deliberate and considered judgment of the highest tribunal in the nation registered again and again in actual litigation in the course of one hundred and nineteen years cannot now be repudiated, except by a dangerous and intolerable abuse of judicial power.

It is too early, because the government exists today under its original constitution and the amendments thereof, and there has not been in its political or economic structure any change so drastic as to make inapplicable the reasoning in *McCulloch v. Maryland* which led to the conclusion that the national banking system of the United States is a useful, convenient, and essential instrument for the effective administration of the federal government under the Constitution.

It is therefore axiomatic that shares of the capital stock of a national bank may not be taxed by a state without the consent of the national government. It is also certain that Congress, having granted the consent, may withdraw it (*Cooley on Const. Lim.* 246; *Stone v. Mississippi*, 101 U. S. 814, 820, 25 L. Ed. 1079) and that once the consent is withdrawn the stock is no longer taxable by a state.

Assuming that shares of the capital stock of a national bank may not be taxed without the consent of the national government, that Congress may give or withhold that consent, and that, having given it, it may in its discretion withdraw it, the remaining question is whether it may withdraw it in part, so as to exempt the shares from taxation while owned by such an agency as the Reconstruction Finance Corporation, but leaving it otherwise in full force and effect, or, in other words, whether such a partial withdrawal of consent violates any constitutional limitation on the legislative power of Congress.

The Act of March 20th, 1936, in part provides that (1) the shares of preferred stock of national banking associations, and (2) shares of the preferred stock, notes and debentures of state banks and trust companies, acquired by the Reconstruction Finance Corporation before and after March 20th, 1936, and the dividends or interest thereon, shall not, so long as said corporation shall own the same, be taxable by any state. In considering the validity of that act in this case, we are concerned only in the validity of that part of it which relates to the taxation of the shares of a national banking association, unless (a) that part of the act which relates to the taxation of shares of the preferred capital stock, notes and debentures of state banks and trust companies is invalid, and (b) is not severable from that part which deals with the taxation of the preferred stock of national banks.

The apparent purpose of extending the immunity to the preferred stock, notes, and debentures of state banking institutions was to avoid the kind of discrimination against state banks which is, by R. S. sec. 5219, for-

bidden against national banks, and as well to relieve the Finance Corporation from the burden of paying taxes on the obligations of state banks acquired by it in the rehabilitation of such banks.

It is an accepted rule of statutory construction that if part of a statute is valid and part invalid, and the good part and the bad are so interwoven and complementary as to compel the conclusion that the Legislature intended that one should not stand without the other, both the good and the bad fall, but that if the two are so independent that the destruction of one does not necessarily affect the purpose and utility of the other, and there is sufficient evidence of a legislative intent that the nullification of one shall not affect the validity or the integrity of the other, that which is good may stand even though that which is bad is annulled and set aside. *Lewis' Sutherland, Statutory Construction,* secs. 296, 297; 59 *C. J.* 639, note 13; *In re Rickell's Estate,* 158 Md. 654, 660, 149 A. 446, 150 A. 25; *Rawlings v. Russell,* 165 Md. 261, 266, 167 A. 186. If the good part and the bad are so dependent one upon the other that the destruction of one necessarily defeats the plain indivisible purpose of the act, then the intention of the Legislature that one may stand without the other cannot prevail. *Ibid.*

Reverting to the Act of March 20th, 1936, it is apparent that the taxation of the capital stock of state banks and the capital stock of national banks are two different and independent things, and that, apart from other objections to its validity, an act dealing with the one subject or the other would be complete and perfect in itself. In such a case the intention of the Legislature must be controlling. This expression of that intent in 12 U. S. Code Ann., sec. 51f: "If any provision, word, or phrase of sections 51d and 51e of this title, or the application thereof to any condition or circumstance, is held invalid, the remainder of such sections, and the application thereof to other conditions or circumstances, shall not be affected thereby," is sufficient to remove any

doubt as to the separability of that part of the act which deals with the taxation of the capital stock of national banks, and that part which deals with the taxation of the capital stock, notes, and debentures of state banks and trust companies.

Assuming that the two parts are severable, it is suggested that so much of the act as affects the preferred stock of national banks is void, because it grants immunity from taxation to an agency which does not exercise any power granted to the national government by the Constitution of the United States, and exercises no governmental function, and thereby unlawfully discriminates in favor of a non-governmental agency, in violation of the due process clause of the Fifth Amendment, and because it derogates from the sovereignty reserved to the states under the Tenth Amendment.

It is conceivable that the due process clause of the Fifth Amendment may be invoked to deny the validity of an Act of Congress which confers upon a private individual some privilege or immunity essentially governmental in its nature, if the grant deprives others of their property, although no case supporting that construction has been cited. The analogies of such cases as. *Heiner v. Donnan*, 285 U. S. 312, 52 S. Ct. 358, 76 L. Ed. 772; *Railroad Retirement Board v. Alton R. Co.*, 295 U. S. 330, 55 S. Ct. 758, 79 L. Ed. 1468; *Morehead v. New York ex rel. Tipaldo*, 298 U. S. 587, 610, 56 S. Ct. 918, 922, 80 L. Ed. 1347, are too remote to be of help, and literally the language of the Amendment is not applicable to a state as such, first, because a state is not a "person," as that word is ordinarily understood (*United States v. Fox*, 94 U. S. 315, 24 L. Ed. 192; *Scott v. Frazier*, D. C., 258 F. 669, 671; *West Coast Mfg. & Inv. Co. v. West Coast Imp. Co.*, 25 Wash. 627, 66 P. 97; *United States v. Balto. & O. R. Co.*, 17 Wall. 322, 84 U. S. 322, 21 L. Ed. 597), although it has been judicially construed as including a state when such an intent is clearly manifested. *Words and Phrases; South Carolina v. United States*, 199 U. S. 437, 454, 26 S. Ct. 110, 50 L. Ed. 261. Nor is

the right of a state to tax property. The purpose of the Fifth Amendment was not to protect the states, but to protect the people of the states against encroachment by the federal government on the privileges and immunities of the citizens therein enumerated. Moreover, if the right of a state to secure funds for the performance of its governmental functions could be regarded as property, the prohibition of the Amendment would not apply here, because the state never had the right to tax shares in a national bank and it could not lose what it never possessed.

The Tenth Amendment, also invoked in the attack on the Act of March 20th, 1936, embodies the familiar principle underlying the whole system of American Constitutional government that: "The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people."

Among the powers thus reserved to the states, that of hampering, hindering, or interfering with the national government in the complete exercise of its granted powers was not included. For, as stated in *South Carolina v. United States*, 199 U. S. 437, 452, 26 S. Ct. 110, 112, 50 L. Ed. 261, "two governments—national and state— are each to exercise their powers so as not to interfere with the free and full exercise by the other of its powers. This proposition, so far as the nation is concerned, was affirmed at an early day in the great case of *McCulloch v. Maryland,* 4 Wheat, 316, 4 L. Ed. 579, in which it was held that the state had no power to pass a law imposing a tax upon the operations of a national bank. The case is familiar and needs not to be quoted from. No answer has ever been made to the argument of Mr. Chief Justice Marshall, and the propositions there laid down have become fundamental in our constitutional jurisprudence." *Austin v. Board etc. of Boston,* 7 Wall. 694, 19 L. Ed. 224, 226. Stating the converse of that theory, it was said in *Texas v. White,* 7 Wall. 700, 725, 19 L. Ed. 227: "Not only, therefore, can there be no loss

of separate and independent autonomy to the States, through their union under the Constitution, but it may be not unreasonably said that the preservation of the States, and the maintenance of the governments, are as much within the design and care of the Constitution as the preservation of the Union and the maintenance of the National government. The Constitution, in all its provisions, looks to an indestructible Union, composed of indestructible States." Since the right to tax is also the power to destroy, neither a state nor the nation has the right to tax the other directly, nor any agency of the other essential to the complete discharge by that other of its governmental functions. It has indeed been held on the one hand that an agency employed by a state to perform a function proprietary rather than governmental in its nature, which, while in aid of the general welfare, is not essential to the full performance of its conventional governmental functions, may be taxed. *South Carolina v. United States,* 199 U. S. 437, 26 S. Ct. 110, 50 L. Ed. 261; *Wheeler Lumber Bridge & Supply Co. v. United States,* 281 U. S. 572, 573, 50 S. Ct. 419, 74 L. Ed. 1047; *Liggett & Myers Tobacco Co. v. United States,* 299 U. S. 383, 57 S. Ct. 329, 81 L. Ed. 294. And on the other that an agency of the national government, but not in fact integrated therewith, employed by it to perform some service, may be taxed, where the tax is not upon the service, but upon the agent in his private capacity, and does not affect the service. *Gromer v. Standard Dredging Co.,* 224 U. S. 362, 371, 32 S. Ct. 499, 56 L. Ed, 801; *Trinityfarm Const. Co. v. Grosjean,* 291 U. S. 466, 472, 54 S. Ct. 469, 470, 78 L. Ed. 918; *Thomas v. Gay,* 169 U. S. 264, 18 S. Ct. 340, 42 L. Ed. 740; *Metcalf & Eddy v. Mitchell,* 269 U. S. 514, 524, 46 S. Ct. 172, 174, 70 L. Ed. 384. It is true that that principle has been applied more rigorously to the exemption of agencies employed by the federal government (*James v. Dravo Contracting Company,* 302 U. S. 134, 58 S. Ct. 208, 82 L. Ed. 125; *Panhandle Oil Co. v. Mississippi,* 277 U. S. 218, 48 S. Ct. 451, 72 L. Ed. 857; *Indian Motor-*

cylce Co. v. United States, 283 U. S. 570, 51 S. Ct. 601.
75 L. Ed. 1277; Graves v. Texas Co., 298 U. S. 393, 56
S. Ct. 818, 80 L. Ed. 1236) than to the exemption of
agencies employed by a state (Liggett & Myers Tobacco
Co. v. United States, 299 U. S. 383, 57 S. Ct. 239, 81
L. Ed. 294) and while in Burnet v. Coronado Oil & Gas ·
Co., 285 U. S. 393, 397, 52 S. Ct. 443, 444, 76 L. Ed. 815,
it was held that the income derived by a lessee of state
school lands from the operation of the property on a
share basis was exempt from a federal income tax and
in it the court reviewed the cases and restated the prin-
ciple that agencies through which either government
exercises its essential governmental powers are immune
from the taxing power of the other (76 L. Ed. 815,
annotation 828; Gillespie v. Oklahoma, 257 U. S. 501,
42 S. Ct. 171, 66 L. Ed. 338; Helvering v. Powers, 293
U. S. 214, 55 S. Ct. 171, 79 L. Ed. 291), both that case
and Gillespie v. Oklahoma, supra, were overruled in
Helvering v. Mountain Producers Corp., 303 U. S. 376,
58 S. Ct. 623, 82 L. Ed. 607. And in James v. Dravo
Contracting Co., supra, the court, referring to the immu-
nity of each government from taxation by the other,
said: "The application of the principle which denies
validity to such a tax has required the observing of
close distinctions in order to maintain the essential free-
dom of government in performing its functions, without
unduly limiting the taxing power which is equally essen-
tial to both nation and state under our dual system."
302 U. S. 134, 58 S. Ct. 208, 216, 82 L. Ed. 125, and
quoted with approval this statement from Willcuts v.
Bunn, 282 U. S. 216, 51 S. Ct. 125, 75 L. Ed. 304: " 'The
power to tax is no less essential than the power to bor-
row money, and, in preserving the latter, it is not neces-
sary to cripple the former by extending the constitu-
tional exemption of taxation to those subjects which fall
within the general application of non-discriminatory
laws, and where no direct burden is laid upon the govern-
mental instrumentality, and there is only a remote, if
any, influence upon the exercise of the functions of gov-
ernment.' "

If the power reserved to the states by the Tenth Amendment did not include the power to tax agencies and instrumentalities employed by the national government in the performance of its governmental functions, *a fortiori* it did not include the power to determine the manner in which that government might exercise its right to consent to the taxation of instrumentalities and agencies employed by it, nor the power to prescribe the conditions which might be attached to such consent. This is not a question of taxation, because the Act of March 20th, 1936, imposes no tax, but of exemption from taxation. And as the stock could not have been taxed without the consent of the federal government, that government had the right to withdraw that consent, in whole or in part, without in any way invading any power reserved to the states by the Tenth Amendment. The statute creates no exemption but restores an exemption which had existed but had been suspended.

Finally it is suggested that such an exemption cannot be granted to an agency not exercising any power delegated to the national government by the Constitution, and not exercising any governmental function, or more briefly to a private corporation incidentally engaged in the performance of duties of a *quasi* public nature.

In *South Carolina v. United States, supra,* it is said: "It will be seen that the only qualifications of the absolute, untrammeled, power to lay and collect excises are that they shall be for public purposes, and that they shall be uniform throughout the United States. All other limitations named in the Constitution relate to taxes, duties, and imposts. If, therefore, we confine our inquiry to the express provisions of the Constitution, there is disclosed no limitation on the power of the general government to collect license taxes." Assuming the condition implied in that case, that taxation must be for a public purpose, and assuming too, although without direct authority, that the same limitation applies to the withdrawal of consent to taxation, that contention must also be denied.

The Reconstruction Finance Corporation was created by Act of Jan. 22nd, 1932 (U. S. Code Ann. title 15, sec. 601 *et seq.*) for these purposes, indicated in its title: "An act to provide emergency financing facilities for financial institutions, to aid in financing agriculture, commerce, and industry, and for other purposes." While not directly attacked, the validity of that act was assumed in *State Tax Commission v. Baltimore National Bank,* 169 Md. 65, 180 A. 260; *Baltimore National Bank v. State Tax Commission,* 297 U. S. 209, 56 S. Ct. 417, 80 L. Ed. 586, and upheld in *Langer v. United States* (C. C. A.) 76 F. 2nd 817, 825, and is not questioned in this case. Its capital stock is $500,000,000, subscribed by the United States, and to be paid for from public funds appropriated out of money in the national treasury. It is managed by a board of directors consisting of the Secretary of the Treasury and six members to be appointed by the President by and with the consent of the Senate. Its officers and directors are required to take an oath of office, and their salaries are paid from funds obtained on the credit of the United States and any increment of said funds, it is granted the free use of the United States mails, and is entitled with its consent to avail itself of information, services, facilities, officers, employees of any executive department of the government, upon its liquidation any unused balance of its funds is to be paid into the United States Treasury, and it is required to make quarterly reports of its operations to Congress. Referring to its purpose and status, the Supreme Court in *Baltimore National Bank v. State Tax Commission, supra,* said: "The purpose that it has aimed to serve is not profit to the government, though profit may at times result from one or more of its activities. The purpose to be served is the rehabilitation of finance and industry and commerce, threatened with prostration as the result of the great depression. We assume, though without deciding even by indirection, that within *McCulloch v. Maryland,* 4 Wheat. 316, 4 L. Ed. 579, a corporation so conceived and operated is an instrumentality of govern-

ment without distinction in that regard between one activity and another. Even on that assumption taxation by state or municipality may overpass the usual limits if the consent of the United States has removed the barriers or lowered them."

In *Federal Land Bank v. Priddy*, 295 U. S. 229, 55 S. Ct. 705, 79 L. Ed. 1408, one of the tests used to determine the governmental character of that corporation was that its stock was in part privately owned, and that it was operated in part for profit. It was decided in *First National Bank v. Beaman*, (C. C. A.) 257 Fed. 729, that stockholders of a national bank which held shares of the capital stock of the Federal Reserve Bank were not by reason of that fact entitled to exemption from state taxation, but that case turned on the court's construction of the consent given by R. S. sec. 5219, but in *Smith v. Kansas City Title & Trust Co.*, 255 U. S. 180, 41 S. Ct. 243, 65 L. Ed. 577, it was held that, the bank having been created in the legitimate exercise of congressional authority, the power to exempt certain bonds issued by it from taxation followed as a matter of course, and in *Federal Land Bank v. Crosland*, 261 U. S. 374, 43 S. Ct. 385, 67 L. Ed. 703, the court recognized the validity of that provision of the Federal Farm Loan Act, sec. 26 (12 U. S. Code Ann. secs. 931-933) which exempted mortgages to the bank from taxation.

As pointed out in *State Tax Commission v. Baltimore National Bank*, 169 Md. 65, 77, 180 A. 260, the Finance Corporation may become, in a way, a partner in a business which it aids, and may share in the profits thereof. But those are mere incidents of its primary purpose and function, which was to rehabilitate institutions which either had collapsed, or which without such aid would have collapsed, by granting credit and aid when all other sources of credit had dried up and there was no other aid.

Mr. Jesse H. Jones, chairman of the corporation, in a statement in evidence under a stipulation, said that, when the act was passed, out of a total of 24,600 banks

in operation in 1930, 5,500, having deposits of three and a half billion dollars, had been forced to suspend even before the bank holiday, and that after the holiday four billion dollars of additional deposits were tied up in nearly 4,200 unlicensed or restricted banks that had been open before the holiday but not thereafter. Depositors fearful for the safety of their funds steadily withdrew their deposits, the deposits of member banks of the Federal Reserve System declined by approximately seven billion dollars, many communities were without banking facilities, private lenders were unable or unwilling to supply additional capital to the banks, and the banks in turn were unable to supply the "essential credit needs of business and industry which suffered accordingly." Bank failures and suspensions were increasing, many states declared bank holidays, even the strongest banks were in danger, and the entire banking system of the nation was facing collapse.

Whatever may be said of the danger that the swift currents of the ever widening whirlpool of federal activities will carry beyond the taxing power of the states so much property as to threaten the very existence of our dual form of government, it cannot be denied that the primary and essential duty of the national government in that crisis was to prevent, if possible, the complete collapse of the nation's credit, irreparable damage to its commerce and industry, and the chaos and disorder which were likely to follow. Nor can it be denied that the Reconstruction Finance Corporation as the agency employed to grant that aid was an essential instrumentality of the national government, created and existing to perform a governmental function of the highest possible importance. Every reason advanced by the courts in support of the immunity of national banks, and the Federal Reserve Bank, from state taxation, applies with at least equal force to the Finance Corporation. Neither performs a function more immediately essential to the continuance and integrity of the national government, while on the other hand both are operated for private

profit, and the stock of both is owned in part by private investors. Nor is there rational support for the theory that the use of the nation's resources to avert a common national disaster is beyond the natural and legitimate scope of the powers granted to the national government "in Order to form a more perfect Union, establish Justice, insure domestic Tranquility, provide for the common defence, promote the general Welfare." Preamble to Constitution.

It is true that the precise question here is not whether all property of the Finance Corporation is exempt from taxation by the states, but whether the discriminatory exemption of preferred stock of national banking associations owned by it from state taxation is unlawful.

While the question cannot be said to be finally settled, such authority as there is supports the conclusion that the "due process" guaranty of the Fifth Amendment embraces within its scope the "equal protection of the laws," guaranteed by the Fourteenth Amendment. *United States v. Armstrong* (D. C.) 265 Fed. 683; *United States v. New York etc. Co.* (C. C.) 165 Fed. 742; *United States v. Yount* (D. C.) 267 Fed. 861; *Sims v. Rives*, 66 App. D. C. 24, 84 Fed. 2nd, 871, *certiorari* denied 298 U. S. 682, 56 S. Ct. 960, 80 L. Ed. 1402. If therefore the Finance Corporation is not a governmental agency, the power of Congress to single it out as the recipient of a special privilege is not wholly free from doubt, *Fountain Park Co. v. Hensler*, 199 Ind. 95, 155 N. E. 465; *Connecticut College v. Calvert*, 87 Conn. 421, 88 A. 633. And it is obviously inconsistent with the spirit and purpose of the entire instrument that the government may favor a particular private individual at the expense and to the detriment of others, unless the grant is definitely and clearly in aid of some public purpose.

It is therefore material to the question under consideration to determine whether the Finance Corporation is in fact a governmental agency created and existing to effect an essential governmental function. If it is, its nature and purpose must afford sufficient basis for the

classification made by the Act of March 20th, 1936. *National Paper & Type Co. v. Bowers*, 266 U. S. 373, 45 S. Ct. 133, 69 L. Ed. 331.

The facts, if they are facts, that the immunity affects the uniform application of the taxing laws of the state, or that it discriminates against banks in other states electing to tax banks upon their income, rather than tax their stock, or against national banks whose capital is supplied from private sources, or against state banks, if the statute, so far as it affects their stock, is invalid, are merely incidents of the valid exercise of a constitutional power, which in no way affects the validity of the Act of 1936. For if the power to grant the immunity existed, and the immunity required changes in the law to harmonize it with the changed conditions thereby caused, the duty devolved upon the state and not the nation to make the change.

But finally the constantly recurring answer to the attack on that statute is that the stock is immune from taxation without the consent of the government, that that consent was given but has been withdrawn as to such of it as is owned by an instrumentality of the national government, and that if taxed while owned by that instrumentality the tax would be paid from public funds dedicated to a public purpose and owned by the national government.

It follows that the order appealed from should be affirmed.

PARKE, SLOAN, and SHEHAN, JJ., dissent.